JOHN MARTIN, APPELLANT, vs. THE PENSACOLA & GEORGIA RAILROAD COMPANY, APPELLEE.

1. Where a party is sued to recover assessments upon his shares in an incorporated railroad company, it is inadmissable to allow oral testimony to be given at the trial as to the *inducements* and *circumstances* which led to the subscription and the *understanding* of the subscribers when they subscribed, unless such testimony goes to establish *fraud* or *mistake*.

2. Where, in such a suit, the defence is that the corporation has accepted from the Legislature an amendment, which radically alters the original charter, to constitute this a good defense the defendant must show affirma-

tively that he *dissented* from such alteration in a reasonable time, before any debts have been contracted or rights have accrued to third parties under such alteration; and it is not incumbent upon the corporation to show his *assent* in order to be able to maintain the action.

3. Where, in the body of the subscription, there is a stipulation for a particular enterprise, as for the building of the road to a particular place, or for its location upon a specified route, such stipulation forms a *condition precedent*, and, unless strictly complied with by the corporation, the party subscribing will be absolved from his obligation to pay.

This case was decided at Tallahassee.

Appeal from Leon Circuit Court.

This was an action of assumpsit, instituted by the appellee against the appellant to recover the amount of subscription for stock in the said Company by Martin, the appellant.

Defendant pleaded non assumpsit, and, by agreement of parties, all substantial defences were to be admitted under that plea.

The record contains a bill of exceptions embracing the testimony offered at the trial and the rulings of the Court thereon, and the instructions given and refused by the Court below to the jury, as follows, viz:

The counsel for the plaintiff, to maintain and prove the issue on his part, offered in evidence the first subscription list of the Pensacola and Georgia Railroad, on which appeared the name of the defendant as a subscriber. It was admitted that the calls had been regularly made, and here the plaintiff closed.

The defendant's counsel, to maintain the issue on his part, offered Gen. R. A. Shine as a witness, who proved that he himself had subscribed for shares in the same railroad to the amount of one hundred thousand dollars. The defendant offered to prove by this witness the inducements and circumstances which led to the subscription of the railroad at the time of the first subscription, which was

objected to and the objection sustained, to which ruling of the Court herein the defendant by his counsel excepted. Witness was then asked what was the understanding of the subscribers when they subscribed, which was objected to and the objection sustained by the Court, to which counsel for defendant excepted. Witness was then asked to what point the road was being constructed, which was ruled to be a proper question, and witness proved that it was in course of construction to Alligator, not on the Georgia line; that he is a Director in said company, and that there has been no survey of any road to the Georgia line and no action taken by the Company having for its object the running of the road from Alligator, or any other point, to the line of Georgia, and that when he and Martin first subscribed, it was to a road to be constructed to the Georgia line; that he, witness, and many other large subscribers were released from their original subscriptions for stock after the acceptance of the provisions of the Internal Improvement act by the Company, which acceptance was proved.

The defendant then offered in evidence the minutes of the Company and the acceptance of the act of 1855, together with the charter of said Company and the act amendatory thereof, which minutes, so offered without objection, are as follows:

"TALLAHASSEE, Nov. 28th, 1853.

"*Resolved*, That correspondence be forthwith opened with the corporation and citizens of Savannah and Albany Railroad Company, to inform them that this Board is fully organized and is prepared to discuss all matters of mutual interest to the two Companies, as well in regard to the proper point at which their contemplated branch road should enter Florida, in view of extending it to Pensacola under the charter granted in this State, as also to ascer-

tain what provision they propose to make, either by sub-
scription of stock in this Company or in any other way,
for the completion of this road from the point of junction
to its Western terminus over and above the sum of
$800,000 pledged to be subscribed in Florida, or above
any larger sum that may be so subscribed, it being appa-
rent that the work will require an addition of two millions
of dollars.

"2d. That immediate correspondence be opened both
with the Atlantic and Gulf Central Railroad Company
and with the Florida Railroad Company, in order to se-
cure harmony of action in an application to Congress for a
grant of public lands contiguous to the respective roads,
and in order to bring the subject before that body early
in the session, and by this correspondence this Board de-
sires to express the deep interest it feels to harmonize with
these Companies in regard to their Eastern or Atlantic
terminus in our own State and in the location of their lines
of road extending Westward and Southward from such
terminus, in view to a junction with this road, in the most
favorable manner for the interest of the respective Com-
panies and for the purpose of ultimately binding all sec-
tions of the State by an extensive railroad system.

"4th. *Resolved*, That the Apalachicola Land Company
being large landed proprietors in the neighborhood of our
contemplated road, should be invited to subscribe liberally
to its stock, or urged to aid in its construction by a grant
of land, in view of the greatly enhanced value it would
confer on their lands generally.

"And it is further ordered, that the large subscriptions
made on the 8th of October last, in the subscription book
at Tallahassee, by Richard Hayward, R. A. Shine, Benj.
F. Whitner, John C. McGehee, Edward Houstoun, D. C.
Wilson and Edward Bradford, for themselves and their

associates, are exempted from the payment of the instalments now called in, as stipulated and provided for at the meeting of the stockholders, and are therefore not liable to be forfeited.

· "TALLAHASSEE, Jan'y 11th, 1854.

" A letter was read from A. S. Baldwin, President of the Atlantic and Gulf Central Railroad Company, containing resolutions adopted by that Company on the subject of a connection with this and a large exposition or argument against our proposed junction with a road from Savannah and in favor of our asking a repeal of our charter, a transfer of our subscriptions to that of the Central road and of making the St. Johns i. e. Jacksonville the Atlantic terminus. After due consideration, the Board was unanimously of opinion that these resolutions and arguments present no sufficient reason or inducement for changing our present plan, while we still desire to cultivate harmony and good understanding with the A. & G. C. and Florida Railroad Companies and believe there will be no serious difficulty, if there is a mutual desire among the several parties.

" TALLAHASSEE, 10th Feb., 1855.

" It was agreed to postpone a full organization of the Board by the election of permanent officers until the 11th of April next.

" The Secretary was instructed to notify the Trustees of the Internal Improvement Fund of the full acceptance by this Company of the provisions of the act to provide for and encourage a liberal system of Internal Improvements in this State, approved 6th January, 1855, and to specify the route lying between Pensacola or the waters of Pensacola Bay and the point of intersection with the Florida Railroad on the most direct practicable line to Jacksonville' with a view to an extension afterwards to the Georgia line,

as that over which this Company proposes to construct its road, which notice is in conformity with the two first resolutions adopted at the recent stockholders' meeting.

"TALLAHASSEE, Oct. 18th, 1855.

"The President stated that the object for calling a meeting of the Board at this time was to consider and act on the report of the Engineers who have been engaged in making surveys of various routes for a railroad from Tallahassee to the town of Alligator, in the county of Columbia. It was expected that the reports, estimates, &c., would be ready to be submitted to the Board.

"The Georgia Railroad Company, if they be compelled to seek a terminus on the Georgia line East of the terminus now contemplated in Hamilton county, may use any part of the Atlantic and Gulf Central Railroad as part of the road of the Pensacola and Georgia Railroad Company to the Georgia line, and, in like manner, the Atlantic and Gulf Central Company may use any part of the road of the Pensacola and Georgia Railroad Company which may intervene between roads on the main line constructed by the Atlantic and Gulf Railroad Company. If when the Pensacola and Georgia Railroad Company shall have constructed their road to Alligator, the other Company shall not have constructed theirs to that point, the former Company shall be at liberty to construct Eastward to the Florida road, or to a junction with the road from Jacksonville West, and, in the latter event, the connection at the point of meeting shall be made on the same terms as provided for a connection at Alligator; and, if any part of the work from Alligator Eastwardly shall have been performed, the Pensacola and Georgia R. R. Co. may adopt that work as a part of their road, they paying therefor the stock of their Company to the amount of the costs of the work; and the

878                          SUPREME COURT.

Martin vs. Pen. & Geo. Railroad Co.—Statement of Case.

Atlantic G. C. R. R. Co., if the other Company do not construct their road to Alligator by the time the A. and Gulf Railroad Co. shall have constructed theirs to that point, to be at liberty to construct Westwardly until they connect with the road of the Pensacola and Georgia Railroad Co., and a connection at such point of meeting shall be established on the same terms as provided for a connection at or near Alligator.

"Fifth. Passengers, freight and cars of each Company shall pass over each road with the same facilities as if the whole road had been constructed by one Company; and passengers, freight and cars on the road to the Georgia line, coming South to the main line from Jacksonville to Pensacola Bay, whether going East or West, after reaching said main line—or passengers, freight or cars passing from any point on the main line from Jacksonville to Pensacola Bay and going up the road to the Georgia line—shall pass with the same facilities as if they shall continue on the main line from Jacksonville to Pensacola Bay.

"The two Companies shall unite in asking the General Assembly to ratify and confirm the agreement which shall be made between them, by proper amendments to their respective charters, in such manner as to give effect to their agreement.

"After some discussion, the report and all the foregoing specifications, except the fifth (5th,) were adopted, and it was ordered that a copy of the report and specifications and the action of the Board thereon be communicated to the Florida Gulf and Atlantic Central Railroad Company by the President of this Company.

"The President stated, that he had heard unofficially that the Tallahassee Railroad Company had appointed a Committee to meet a similar Committee of this Board to confer together as to the terms and conditions on which a

juncture of the roads of the two Companies can best be effected.

"Oct. 30, 1855.—A vote was then taken on the various modifications of this route and resulted in the adoption of line 2, which was from Tallahassee to or near Bailey's, then near Capt. L. Baileys and William Scruggs, in Jefferson county, and, crossing the Aucilla below Sandy Ford, passes through the Northern part of Patterson Hammock, and leaving Madison C. H. to the North; crosses the Suwannee river near Columbus, and thence to a point near Alligator, in Columbia county."

It was admitted, that at the time of the subscription made by Martin to the stock of the Pensacola and Georgia Railroad, whose name is on the first subscription list, that said subscription was made, together with others, with a view to a connection with Georgia and to control the majority of the stock of the Pensacola and Georgia Railroad and secure a connection.

Here defendant closed.

The plaintiff then called F. H. Flagg as a witness, who proved that the Pensacola and Georgia Railroad Company commenced work in the fall of 1855; that the road is graded to Suwannee; that he called on Martin for the payment of his subscription; that he refused and said that Gen'l Shine had persuaded him and promised him to take it off his hands, as he did not want it.

The subscription of the 9th May, 1855, was offered in evidence without objection. Mr. Flagg was asked by plaintiff as to the acquisitions of the Company under the act of 1856. Objected to by defendant—objection sustained.

Cross-examined and asked whether defendant was present at the meeting of stockholders which accepted the Internal Improvement act? He stated that he did not know;

that he never saw him; does not know that he ever assented to the change in the route of the Pensacola and Georgia Railroad from the originally contemplated route to the line of Georgia. Gen'l Shine also proved the same thing.

Walker Gwynn, a witness for plaintiff, testified " that the Pensacola and Georgia Railroad will be entitled, under the act of Congress of 17th May, 1856, to 1,167,360 acres of land, and, under the act of the Legislature of Florida of 6th January, 1855, to 139,210 acres of State land. I have located, examined and appraised, on the line between Tallahassee and Alligator, 363,607 84-100 acres, which I have appraised at an average of about $1 79 per acre. Of this, about 200,000 acres lie in Columbia county, between the Suwannee river and Alligator, my average appraisement of which is about $2 08 per acre."

Here the testimony closed, and, after argument of counsel, the counsel ·for defendant moved the Court to charge the jury as follows:

That the charter of the Pensacola and Georgia Railroad Company, as it existed at the time of defendant's subscription, is as much a part of the contract as though the same had been embodied in the caption to the subscription paper, and that no material alteration could be made in said contract by the Pensacola and Georgia Railroad Company, or by the defendant, without the consent of both parties. Therefore, if the jury find that the road now in course of construction is a different road from that set forth and contemplated in the original charter, the defendant is not bound for the instalments called in, unless the assent to such change of route by the defendant has been proved; or, if the jury find that the terminus of the present road is at a point not contemplated by the original charter, the defendant is not bound, unless his assent to

such change is poved; that the charter constituted part of the contract of subscription, and that an alteration in the route of the road or in its termination which would defeat the original object intended by the corporation would release the defendant, if made without his consent.

If the jury believe from the evidence that the original objects and purposes of the defendant in subscribing for the route and terminus contemplated in the original char. ter were materially defeated by the adoption of the present route and terminus, then he was not further bound for his subscription, and they should find for the defendant.

Which instructions were refused, and, in lieu thereof, the Court gave the following:

The charter of the Pensacola and Georgia Railroad Co., as it existed at the time of the defendant's subscription, is a part of the contract, and no material alteration could be made in said contract by the Pensacola and Georgia Railroad Co., or the defendant, without the consent of both parties. If, therefore, the jury believe from the evidence that the road now being constructed is a different road from that set forth in the original charter, the defendant is not bound unless he assents; or, if the jury believe from the evidence that the terminus of the present road is at a point not contemplated by the original charter, the defendant is not bound, unless he assents to the change.

The counsel for plaintiff then asked the following instructions, which were given:

That the acceptance of the Internal Improvement act is consistent with the purposes of the Pensacola and Georgia Railroad Company and is auxiliary only. That the acceptance by the Pensacola and Georgia Railroad of the Internal Improvement act was an act of the stockholders of said Company, and, if the charter of the Company is violated by said acceptance, the charter is not thereby altered, but

the act of acceptance is void; that the Pensacola and Georgia Railroad Company, after the subscriptions were made, could determine its Eastern terminus at any place on the Georgia line and from time to time change its policy as to the Eastern terminus; that the Company was competent to stipulate for a terminus East of the Alapaha; that the defendant must show that he made timely objection to the acceptance of the Internal Improvement act, and the presumption is, in the absence of proof to the contrary, that he assented to the action of the stockholders, who unanimously accepted the act; and especially is this presumption proper where the Company has contracted debts to large amounts before any objection is made.

To which instructions so given, and to the rulings of the Court herein, the defendant by his counsel excepted.

Defendant asked the following charge:

If the jury shall believe from the evidence that the Legislature or the corporation have undertaken to embark this corporator in a speculation to which he never consented, or in any enterprise to which he never gave his consent, then he is absolved from his subscription and the majority cannot bind him.

Which instruction was refused. To all which refusals of the Court to admit or allow the evidence of the defendant and to the charges given for plaintiff, and refusal to give the charges asked for by defendant, and the rulings of the Court therein, defendant by his counsel did then and there except.

A verdict and judgment having been rendered for the plaintiff, defendant appealed.

*W. Call* and *D. P. Hogue* for appellant.

*J. T. Archer* and *R. B. Hilton* for appellee.

DuPONT, J., delivered the opinion of the Court.

This is a case of a chartered Railroad Company suing a recusant stockholder, to recover in an action of assumpsit the amount assessed upon his subscription to the capital stock of the Company. The stockholder pleaded simply "non-assumpsit," with the privilege of giving in evidence under that plea all substantial matters of defence. The defence attempted to be set up at the trial was, that the Company, by the acceptance of the provisions of the Internal Improvement act of 1855, and by amendments obtained from the Legislature subsequent to the date of the subscription for stock, had materially altered and varied from the object and design contemplated, and set forth in the original charter of incorporation; that he, the defendant, *did not assent* to this alteration, and that he was consequently discharged from his obligation to pay. A large amount of evidence, documentary and oral, was adduced with the purpose to sustain this point of the defence, and the defendant also offered a witness to prove the inducements held out at the time to individuals to subscribe to the capital stock of the Company, but the Court refused to permit him to be questioned to that point.

The exceptions taken below embrace as well the rejection of this witness as the instructions to the jury given and refused. The assignment of errors in this Court corresponds with the exceptions. The case here was elaborately argued and ably contested by the counsel on either side. The discussion took a wide range and resulted in bringing to the notice of the Court a very large number of adjudicated cases, embracing the entire subject of the rights and duties of corporations. We are admonished by the discursiveness of the opinions delivered in those cases, and the many mere *dicta* to be found, of the great cau-

tion which ought to be observed in giving an expression of opinion on points which do not legitimately arise out of the case before us.

In this age, when all the great improvements of the country are inaugurated under the influence of and owe their successful consummation to associated capital, it would be dangerous for the Court to anticipate questions which, whenever they shall legitimately arise, may tax to their fullest powers the most gigantic intellect. The law applicable to railroad charters in particular is just now in its formation or chrysalis state. They are of recent origin, and the rules to be applied to them are yet to be definitely settled. It would be well for the interest of the country and creditable to the judiciary as an institution that, in the establishment of these rules, the commendable caution of those great Judges, under whose plastic hands the common law was brought into being, should be closely imitated. Under these impressions and influenced by these considerations, we desire to enter upon the examination of the law which is to govern in this case.

The first question that addresses itself to our consideration grows out of the refusal of the Court to permit a witness who had been offered to testify as to the "inducements and circumstances which led to the subscriptions to the railroad at the time of the first subscription," and also as to "the understanding of the subscribers when they subscribed." We do not think that this exception is well taken. It is an elementary principle of the law of evidence that oral testimony shall not be admitted to vary the terms of a written contract, and, upon this principle, it has been ruled that such evidence is inadmissible to vary the terms of a subscription to the stock of a railway, unless it tend to show fraud or mistake.— *Vide* Redfield's

Law of Railways, 70, citing 16 B. Monroe, 5; 20 Vermont Reps., 509; 34 Maine Reps., 369.

There was no pretence, even in argument, that there had been any fraudulent misrepresentations made to the defendant to induce him to become a subscriber to the stock of this Company, or that he had made his subscription under a mistake as to the terms of the charter of incorporation. Indeed, the point was not greatly insisted upon.

Of the other exceptions, all of which are grounded upon the instructions to the jury, either granted or refused, we will consider first the fifth instruction given, which is in the following words, viz:

"That the defendant must show that he made timely objection to the acceptance of the Internal Improvement act, and the presumption is, in the absence of proof to the contrary, that he assented to the action of the stockholders who unanimously accepted the act, and especially is the presumption proper where the Company has contracted debts to large amounts before any objection is made."

The evidence in the record, of which the instruction is predicated, is a resolution, passed at a meeting of the *stockholders*, under date of the 10th of February, A. D. 1855, instructing the Secretary of the Company to notify the Trustees of the Internal Improvement Fund of "the full acceptance by the Company of the provisions of the act to provide for and encourage a liberal system of Internal Improvements in this State, approved 6th of January, 1855." There was no evidence to show whether or not the defendant was present at that meeting, nor was it shown or attempted to be shown, that he ever objected to the act of acceptance. The only objection he appears ever to have made was when he was called on by Mr. Flagg, the

Secretary of the Company, to pay the assessment on his shares of stock. He then objected to pay, but his objection was based, not on any alteration of the charter by the acceptance aforesaid or otherwise, but expressly upon the alleged ground "*that Gen. Shine had persuaded him and promised to take it off his hands, as he did not want it.*"

This instruction raises the question, how far an individual shareholder in an incorporated Company is *bound* by the action of a Board of *stockholders* duly convened and organized. It is too clear to require any argument or authority to support it, that so long as the action of the Board is within the scope of its legitimate powers and limited to the promotion of the particular enterprise contemplated in the original charter of incorporation, so long do their acts, regularly passed, bind the individual shareholder, and he has no right to claim any immunity, nor can he relieve himself from his duty and obligation as a shareholder even though he should *dissent* in the most formal manner. It is only when the action of the Board is such as proposes to vary from, add to or radically alter the character of the original enterprise, and thereby impose new duties and obligations, that the question can ever arise. For the purposes of this argument, it will be assumed that the act of the Board of stockholders, in accepting the provisions of the Internal Improvement act, was of the latter character. Much error has crept into the books by the attempt to assimilate corporations to ordinary partnerships, and to apply to the one the rules of law peculiarly applicable to the other. Thus, in Angel & Ames on Corporations, where reference is made to the liabilities of individual members of a partnership, it is said: "Such precisely is the law with regard to partnership associations which are *incorporated*, and no point of law is more clearly and firmly settled than that, if a corpo-

ration procure an alteration to be made in its charter by which a new and different business is superadded to that originally contemplated, such of the stockholders *as do not assent* to the alteration will be absolved from liability on their subscription to the capital stock."

This proposition, as enunciated, is not sufficiently qualified. If by the term "assent" it is designed to convey the idea that in such case each individual corporator must, in order to have his liability fixed, signify his concurrence by *express assent*, the proposition is certainly incorrect, as it ignores the fact that, from the very nature and constitution of these respective associations, the individual in the one case speaks through his representative, the majority, in the other he speaks in *propria personæ*. In the same authority it is said: "Corporations are subject to the emphatically republican principle (supposing the charter to be silent) that the whole are bound by the acts of the *majority* when those acts are conformable to the articles of the constitution."

It seems, says Mr. Kyd, "to be the first suggestion of reason that an act done by a simple majority of a collective body of men, which concerns the common interest, should be binding on the whole, and this is the principle of the rule adopted by the 'common law' of England with respect to aggregate corporations."—1 Kyd on Corporations, 422.

Upon these principles, it would seem that where the Company undertakes to depart from or add to the original object or design, as set forth in the articles of association or charter of incorporation, there is this manifest difference between a simple partnership and an incorporated association: in the former, the assent of the individual member is not to be assumed—it is to be affirmatively established by competent proof; in the latter, his assent will be pre-

386 SUPREME COURT.

Martin vs. Pen. & Geo. Railroad Co.—Opinion of Court.

sumed unless he affirmatively proves his *dissent*. The ground of difference will be obvious to any reflecting mind. In the former case, the association being usually limited to a few members, they are generally competent to act in mass, whereas, the latter being composed of numerous individuals, residing in remote localities, they are constrained, by the very necessity of the case, to speak through a conventional medium, viz: an organized majority. If this were not so, then would great inconvenience arise whenever it should become necessary for the interest of the association to vary from or add to the objects of the original enterprise. How would it ever be possible to obtain the *express assent* of each corporator? In many cases, their particular localities would be unknown, and, if originally known, may have been changed from place to place. If this were not so, then, in every case of the decease of a stockholder, the corporation could accept no alteration of its charter, however such alteration might promote its interest and the consequent interest of each individual corporator, without reducing the original capital by the amount of stock standing in the name of the deceased; for, it will not be pretended that the executor or administrator would have the authority, in such case, to *assent*, however clear it is that he would have the right to *dissent* from the attempt to involve the estate in the new enterprise. Again, if this were not so, the rights and interests of the creditors would be at the mercy of the corporation; for, upon discovering that the prosecution of the original design of the charter had involved it in debt and that its further pursuit was likely to prove unprofitable and disastrous, in order to absolve its members from liability from any further calls, it would only be necessary to obtain from the Legislature an alteration of the charter, accept it by a meeting of stockholders composed of a bare *quorum* under the pro-

visions of the charter, and, as each individual might be sued upon his subscription, he would plead a want of *express assent*, and, unless it could be affirmatively proved that he was present at the meeting, he would be released and the creditors defrauded of their just rights. But how is the fact of his presence to be proved? Who is the witness that will prove that he was at the meeting and consented to the alteration?

The case before us fully illustrates our views; for, of all the witnesses interrogated, none could remember whether or not the defendant was present at the meeting which accepted the provisions of the Internal Improvement act, which, it is alleged, made a material alteration in the object contemplated in the original charter. And yet he may have been present, consenting to the act of acceptance, and, for the lack of this *proof*, he is to be absolved from his liability on his subscription, and the creditors, contractors and laborers, who had given credit in part upon the faith of his subscription, be deprived of their just rights, and this, too, without the slightest pretence that any injury or loss has or was likely to accrue to him from the alleged alteration.

It seems to us that the distinction rests upon the most rational grounds, and that the rule to be observed on this subject is, that whenever the corporation accepts from the Legislature a material alteration of their charter, if the same be done by the stockholders in general meeting, duly organized, it is binding upon each individual member, unless he shall expressly *dissent* therefrom before any debts are contracted or rights enure to third parties in carrying out the new design or enterprise. In this case, the defendant stands by from February, 1855, sees the work progressing under the provisions of the Internal Improvement act, silently acquiesces in the contraction of a large

indebtedness, makes no whisper of disapprobation until he is called on to pay his assessment by the agent of the Company, when, for the first time, he objects to pay, not, however, on the ground of any alleged alteration of the charter, but for the avowed reason that " Gen'l Shine had persuaded him and promised to take it (the stock) off his hands, as he did not want it."

To release the defendant from liability on his subscription upon the ground particularly insisted on at the argument, under the circumstances developed by the record, would be to introduce into our jurisprudence a system of *naked technicalities, disorganizing in their application* and pregnant with disaster and ruin to all the great enterprises in which our young and growing State has so largely embarked. We here repeat in substance what has heretofore been enunciated by the Court, that while these corporations are to be held in strict accountability and to the careful observance of the limitations of their chartered powers, the cause of justice, the best interests of society and the general weal of the commonwealth require that the practice of the utmost good faith should be rigidly enforced between them and their stockholders.

Another prevalent error upon this point is, that of holding that an agreement to take stock in a railroad corporation is to be viewed simply in the light of a contract between individuals, and that it is subject to the same rules that are applicable to private contracts; but such is not the case and for very manifest and obvious reasons, which commend themselves to the commonest understanding as being based upon considerations of the highest import. When a man enters into a private agreement with another, the individual interests of each (with which the public have no concern) are alone involved, and no change or alteration of the slightest character may be

made without the mutual consent of the parties *expressly given*. Each stands to the "bond," even to the exaction of "the pound of flesh." Not so, however, in the case of a subscription to the stock of an incorporation, which owes its existence to the creative power of the Legislature and is always designed and intended to subserve, in some measure, the public good. In such case, the stipulations of the contract are contained in the charter alone and are of a general character. The individual subscribes to the contract with the distinct knowledge and understanding that its terms may be varied at any time by a concurrence between the majority of his associates and the Legislature, and that, too, without his *assent* and in defiance of his *dissent*. Nay, he subscribes with the distinct knowledge that, with such concurrence, the terms of the charter may be totally altered, so that the corporation may be authorized to embark in new enterprises wholly and essentially different from those originally contemplated, and that his only remedy is to *dissent and withdraw from the association*.

With these distinguishing features, can it be seriously contended that a mere subscription to the stock of a corporation stands upon the same footing and is to be governed in all respects by the general law of contracts as applicable to private or individual agreements?

The Court has not been neglectful of the adjudicated cases which were cited by the counsel on both sides, but, upon a careful examination of these cases, we have found so much looseness of expression, so much mere *dicta* and such a conflict of views upon the various questions discussed, that we have chosen rather to base this argument upon a few plain fundamental principles than to attempt to reconcile authorities which are clearly irreconcilable. To guard against misapprehension, we remark in this connex-

tion, that where, in the body of the subscription, there is a stipulation for a *particular* enterprise, as for the building of a road to a particular place, or for its location upon a specified route, such a stipulation being outside of the terms of the charter, is in the nature of a *condition prece-dent*, and, unless strictly complied with by the corporation, the party subscribing is absolved from his obligation to pay. We hold, then, that this instruction was in strict conformity with the law, and upon the state of the evidence, as developed in the record, that it was conclusive of the case.

For the purposes of the foregoing argument, it was *assumed* that the original charter of the P. &. G. R. R. Co. had been radically changed and altered by the acceptance by the Company of the provisions of the Internal Improvement act. But if this, upon examination, should turn out to be so in *point of fact*, it will be readily perceived that such conclusion would not avail the defendant; for, from the view which we have taken of the question involved in the discussion of the fifth instruction, the *onus* of proving affirmatively his *dissent* to the alleged alteration was upon him. It therefore becomes unnecessary to the decision of the case to enquire as to the effect of the acceptance of the provisions of the act upon the charter of the Company, and we pass to the sixth exception embraced in the assignment of errors, which complains of the instructions given by the Court as having been calculated to mislead the jury in the formation of their verdict. We have carefully examined the instructions with reference to this exception, and have come to the conclusion that the defendant has no cause to complain of them in this respect, for they are certainly more favorable to the defence than he was entitled to demand.

It is therefore ordered and adjudged that the judgment

of the Circuit Court of Leon Circuit, rendered in this cause, be affirmed with costs.