CHARLES E. SAVAGE *vs.* J. KEMP BARTLETT, JR., Trustee of THE VALLEY LAND AND IMPROVEMENT COMPANY.

*Insolvent corporation—Procurement of Subscription through Fraud—Repudiation by Subscriber.*

Where a subscription to the capital stock of a corporation was procured through the false and fraudulent representations of the corporation, and the subscriber, without laches or unreasonable delay in discovering the fraud, and within a reasonable time after such discovery, and before the execution by the corporation of a deed conveying its property in trust for the benefit of its creditors, notified the president of the corporation that he repudiated the contract, and refused to make any further payments on account of his subscription, such facts constitute a valid defence to an action by the trustee to recover from the subscriber the unpaid instalments due upon his subscription.

APPEAL from the Baltimore City Court.

The case is stated in the opinion of the Court.

*Exception.*—At the trial the plaintiff offered the two following prayers:

1. That the defendant having produced the paper dated July 11, 1890, and having admitted that he accepted that paper or receipt, and that he paid the money therein mentioned for fifty shares of the stock of the Valley Land and Improvement Company on the terms stated in said receipt and in the prospectus therein mentioned, and offered in evidence, the company had the authority of the defendant to register his name upon its books as a stockholder of fifty shares of its capital stock; and that if the jury find that the name of the defendant was so entered upon the books of the company as a stock-

36 v. 78.

holder of fifty shares of its stock; and if the jury shall further find, that after the defendant had accepted said receipt and had paid the money therein mentioned, and had been registered in the stock books of the company as the owner of fifty shares of its stock, said company contracted a large amount of indebtedness which yet remains unpaid; and if the jury shall further find, that at the time said indebtedness was contracted, the defendant's name was registered in the company's books as a shareholder of fifty shares of its capital stock as above set forth, then, by force of the laws of Virginia offered in evidence, and by force of the decree of the Circuit Court of Page County, offered in evidence in the case in which E. C. R. Humphries and others were plaintiffs and the Valley Land and Improvement Company and others were defendants, and of the deed of trust offered in evidence from the Valley Land and Improvement Company to Andrew Broaddus and others, the plaintiff is entitled to recover in this suit the whole amount yet remaining unpaid of the cost of said fifty shares of stock of the said company, with interest thereon, as to sixty per cent. of that amount, from the date of the purchase of said shares by said defendant.

2. That there is no evidence legally sufficient to establish such a rescission of the contract of the defendant as a stockholder of the Valley Land and Improvement Company as to discharge him from liability as such stockholder in this suit.

The defendant offered five prayers, the third and fourth of which only, as follows, were passed upon by the Court:

3. That if the jury shall find that the defendant contracted with the Valley Land and Improvement Company to purchase from it fifty shares of its capital stock for the sum of five thousand dollars, and paid two thousand dollars on account thereof, and that said contract

was entered into. after the agents of the said company, with one of whom, acting on its behalf, the said contract was made, had exhibited to the defendant the prospectus offered in evidence, and that said company delivered to the defendant the memorandum and receipt signed by J. D. Wheeler, offered in evidence, and that the prospectus referred to in said memorandum and receipt is the one offered in evidence; and shall further find that said prospectus contained fraudulent and material misrepresentations of facts of a nature calculated to induce subscriptions to the said stock; and shall further find, that in the month of January, 1891, while the said company was still a going concern, conducting its business through its officers, the defendant called upon the president of the said company and notified him that he would not be bound by his said contract of purchase, and would make no further payments thereunder, and shall further find that he did so because he had learned of some of the said misrepresentations, and that said notice was given within a reasonable time after he had obtained said information, and that defendant was a citizen of Maryland, then the plaintiff is not entitled to a recovery.

4. That if the jury shall find that the prospectus offered in evidence had been exhibited by the agent or agents of the Valley Land and Improvement Company to the defendant, before any contract was entered into between said company and him, with a view to induce him to take the stock mentioned in the evidence, and that said prospectus formed part of the contract with reference to said stock, between said company and the defendant, and that when said contract was made said company did not own and control the Luray Inn and Caverns, or had not acquired about twenty-five hundred acres of the choicest land for building sites and manufacturing purposes, in and around the said hotel, cav-

ern's and the town of Luray, or did not own all the available lands suitable for said purposes, or did not own or control about eight thousand acres of the best mineral properties in Virginia, consisting of iron, manganese and other valuable minerals, or shall find that it is untrue to any material extent that the books of subscription or sale of said stock were hardly opened, when one hundred thousand dollars were subscribed, and that the defendant heard, after the lot sale, circumstances putting him on enquiry as to said misrepresentations, or some of them, and that within a reasonable time after the defendant learned of the falseness of the representations contained in the said prospectus, in any of the above mentioned particulars, he called in the month of January, 1891, on the president of said company, and gave him notice that he would no longer be bound by said contract, or make any further payments thereon, and before such visit gave him like notice by letter; and shall further find, that when such notice was given, the said company was a going concern, engaged in the conduct of its business by its own officers, and also that the defendant is a citizen of Maryland, then their verdict ought to be for the defendant.

The Court (WRIGHT, J.,) granted the prayers of the plaintiff, and rejected those of the defendant. The defendant excepted, and the verdict and judgment being against him, he appealed.

The cause was argued before ROBINSON, C. J., BRYAN, PAGE, ROBERTS, and McSHERRY, J.

*William A. Fisher,* (with whom was *John H. Lowe,* on the brief,) for the appellant.

*Charles Marshall,* (with whom was *Joseph C. France,* on the brief,) for the appellee.

Savage *vs.* Bartlett.

ROBINSON, C. J., delivered the opinion of the Court.

The Valley Land and Improvement Company was incorporated by an Act of the Legislature of the State of Virginia, approved January 29th, 1890, with a capital stock of $2,000,000. In April, 1891, within fifteen months after its incorporation, the company executed a deed of trust, conveying all its property, including its unpaid capital stock, to trustees for the benefit of its creditors. In August of the same year, upon a bill filed by the creditors in the Circuit Court of Page County, Virginia, the plaintiff was appointed sole trustee to execute the deed of trust in the place of the four trustees therein named, and was authorized and directed to collect all moneys due upon subscriptions to its capital stock. This is an action *at law* brought by the plaintiff, as trustee, against the defendant, to recover the unpaid instalments due by him upon his subscription to the capital stock of the company. The defence is that the defendant was induced to become a shareholder upon the faith of certain representations set forth in a *prospectus* issued by the company, and that these representations were false and fraudulent, and that the defendant, within a reasonable time after the discovery of the fraud, and before the execution of the deed of trust, notified the president of the company, that he repudiated the contract, and refused to make any further payments on account of his subscription. And the question is whether these facts, if found by the jury, constitute a valid defence to the action. As against the company itself it is well settled that a shareholder may rescind a contract of subscription procured through the fraud of the company, within a reasonable time after the discovery of the fraud. "Contracts of this description," says Lord ROMILLY, "between an individual and a company, so far as misrepresentation or suppression of the truth is concerned, are to be treated like contracts be-

tween any two individuals. If one man makes a false statement, which misleads another, the way in which that is to be treated affords the example for the way in which a contract is to be treated where a company makes a false statement which misleads an individual." *Venezuela Central Railway Company vs. Kisch, Law Rep.*, 2 *Eng. & Irish Appeals*, 99. And this well settled rule applies with even greater strictness in regard to representations set forth in a *prospectus* issued by a company for the purpose of inviting persons to join in the undertaking; and although some allowance must be made for the manner in which the advantages which are likely to be enjoyed by the subscribers are described, yet, as was said by the Lord Chancellor in the case to which we have just referred, "no misstatement or concealment of any material facts or circumstances ought to be permitted." And then be quotes with approval what was said by Vice-Chancellor KINDERSLEY in the case of the *New Brunswick and Canada 'Railway, &c. Company vs. Muggeridge*, 1 *Drew. & Sm.*, 381, "Those who issue a prospectus holding out to the public the great advantages which will accrue to persons who will take shares in a proposed undertaking, and inviting them to take shares on the faith of the representations therein contained, are bound to state everything with strict and scrupulous accuracy, and not only to abstain from stating as a fact that which is not so, but to omit no one fact within their knowledge, the existence of which might in any degree affect the nature, or extent, or quality of the privileges and advantages which the prospectus holds out as inducements to take shares." At the same time, contracts of subscription procured by fraud are *not void, but voidable*, at the election of the shareholder; for although deceived and misled, he has the right to abide by the contract. If, however, he means to rescind the contract, he must do so within a

reasonable time after the discovery of the fraud. "A man must not," says Lord ROMILLY, "play fast and loose, he must not say I will abide by the company if success-ful, and I will leave the company if it fails, and there-fore, when a misrepresentation is made of which any one of the shareholders has notice and can take advantage to avoid his contract with the company, it is his duty to determine at once whether he will depart from the company or whether he will remain a member." *Ash-ley's Case, L. Rep.,* 9 *Eq.,* 262.

In the prospectus issued by the company in this case, it is stated:

1.    That the company was the owner of the famous Luray Inn with all its furniture and equipments.

2.    That it was the owner of the famous Luray Caverns.

3.    That it had acquired and owned 2500 acres of the choicest lands for building and manufacturing purposes, and in fact all the available land for these purposes in and around the hotel, caverns and town of Luray.

4.    That it owned and controlled 8000 acres of the best mineral properties in Virginia, consisting of iron, man-ganese, and other valuable minerals.

Instead of being the owner, the defendant proved that the company had merely *the option* to buy these properties at certain stipulated prices; that this option had been assigned to the company by D. F. Kagey and his associates, some of whom were prometers of the un-dertaking, and that in consideration of the assignment of said option, the company had issued certificates of stock to Kagey and his associates of the par value of $400,000, and that the amount which would have been required on the 7th July, 1890,—the date of the defend-ant's subscription,—to enable the company even to avail itself of the options, exceeded the sum of $300,000 over and above the entire receipts of the company, up to that

time. The defendant further proved, that a Mr. Leyburn had in fact procured the option for the purchase of 4000 acres' of the so-called valuable mineral land for $2 per acre, and that he had assigned said option to Kagey and Marshall for fifty shares of the stock of the company. The defendant then proved it was not until November, 1890, three months after his subscription, that he discovered the fraudulent character of the representations set forth in the prospectus, and that shortly afterwards, in January, 1891, and before the execution of the deed of trust he notified the president of the company of his repudiation of the contract, and of his refusal to make any further payments on account of the same.

Here was evidence to go to the jury, not only to prove that the defendant's subscription was obtained by fraud, but that he had also within a reasonable time after the discovery of the fraud, rescinded the contract. And as there does not seem to be any question as to *laches* on his part, these facts, if found by the jury, would according to all the authorities have been a valid defence in an action brought by the company itself. But whilst it is conceded that a defrauded shareholder may by a proper proceeding rescind the contract, the argument is that the act of rescission must be of such a nature as to remove his name from the books of the company, and for the reason that persons dealing with the company are presumed to have given credit to the company upon the faith of his subscription.

This may be considered the settled law in England, and, further, that the proceeding to remove his name from the *register* must be instituted by the subscriber before the insolvency of the company. In the leading case of *Oakes vs. Turquand,* decided in the House of Lords in 1867, it was held that the application to remove the name of a member from the register on the ground that the subscription was procured through the fraud

of the company must be made before the commencement of winding-up proceedings. *L. R.*, 2 *H. L.*, 325.

"If a demand had been made upon Mr. Oakes for a call," says Lord COLONSAY, "while the company was a going concern, and he had resisted it on the ground of fraud, I think he might have been entitled to succeed in that resistance, and to have his name removed from the register." And in the later case of *The Reese River Silver Mining Co. vs. Smith*, 4 *Eng. & Irish Appeals*, 64, it was decided that "where an application has been made by a defrauded shareholder for the rescission of the contract and the removal of his name from the register, his right to a rescission will not be affected by the fact that winding-up proceedings intervene before his suit for rescission has been determined."

These cases, however, are based upon the provisions of the English Companies Act of 1862, entitled "An Act for the Incorporation, Regulation and Winding-up of Trading Companies and other Associations." By this Act, a public officer was appointed for keeping a register of, amongst other things, the name of the projected company; a statement of the nature of its intended business, the amount of its capital, the names and addresses of every subscriber, with the number of shares taken by him and the amount paid on each share. And, in the event of a company being wound up, the Act provides, that every member shall be liable to contribute to the assets of the company to an amount sufficient for the payment of its debts and liabilities. It further provides, that the register shall be open to the inspection, not only of the members, but al lother persons, and any person whose name has been wrongfully registered may apply to any superior Court of law or equity for a rectification of the register.

The Act contains no less than two hundred and twelve sections, collecting as it were into one Code, the provi-

sions which were thenceforth to be applicable to such companies; "provisions intended," says Lord COLONSAY, "on the one hand to preserve the members from unnecessary molestation by creditors of the company, and on the other hand, to preserve the rights of creditors to ultimate payment out of the estates of the members." *Oakes vs. Turquand.* "The liability of the shareholders," says the Lord Chancellor, "is a statutable liability, under which the creditors have a right which attaches upon the shareholders, to compel them to contribute to the extent of their shares toward the payment of the debts of the company." And as was said in *Oakes vs. Turquand,* "the Legislature took care to provide by registration the means of enabling persons dealing with the company to know whom and to what they had to trust. It intended to put the persons whose names are on it, in the same position towards creditors as persons engaged in an ordinary partnership."

And in adopting the rules of law laid down in the English cases, the text writers, some at least, have overlooked, it seems to us, the fact that these cases were governed and decided under the provisions of the Companies Act of 1862. There is however no such Act in force in this State, and although a defrauded shareholder may file a bill in equity to have his name removed from the books of the company, there is no fixed rule established which denies to him the right of rescinding a fraudulent contract, except by a proceeding of that kind. Nor can it be said that there is an established rule which denies to him the right to rescind the contract, even after the insolvency of the company, without reference to the diligence exercised by him in ascertaining his right and in repudiating the fraud practiced upon him.

In *Upton, Assignee vs. Tribilcock,* 91 *U. S.,* 45, where a suit was brought by the assignee of an insolvent com-

pany, and the defence was that the subscription had been procured by the false representations of the agent of the company, the Supreme Court held that such a defence was not available under the facts in that case, because the shareholder had failed to use due diligence in ascertaining the truth or falsity of the representations, and in repudiating the contract. In that case, the shareholder did not repudiate the contract until *three years* after his subscription, nor until a demand had been made by the assignee. But his right to repudiate the contract on the ground of fraud apart from the question of laches on his part, and the right to repudiate it without a proceeding against the company to remove his name from the books of the company is distinctly recognized. There is no intimation or suggestion on the part of the Court, that a proceeding of any kind was necessary to enable a defrauded shareholder to rescind the contract. It seems to have been conceded that a notification to the company by the shareholder, of his rescission of the contract was all that was required. And in the dissenting opinion of Mr. Justice MILLER, in which the Chief Justice and Mr. Justice BRADLEY concurred, he says : "I am of opinion that where an agent of an existing corporation, procures a subscription of additional stock in it by fraudulent representations, the fraud can be relied on as a defence to a suit for the unpaid instalments, when suit is brought by the corporation; and that if the stockholder has in reasonable time repudiated the contract, *and offered to rescind* it before the insolvency or bankruptcy of the corporation, the defence is valid against the assignee of the corporation. I also think there was evidence of such fraud in this case, and that the question of reasonable diligence in the offer to rescind was fairly put to the jury."

And in *Upton, Assignee vs. Englehart*, 3 *Dillon's Circuit Ct. Rep.*, 496, where a suit was brought by the assignee

of the same company, and the defendant pleaded that he was induced to purchase the stock by the fraudulent representations of the agent of the company, and that "he was in no way bound thereby, and that he long ago repudiated said purchase by refusing to pay any more" of the instalments, Judge DILLON held the plea to be defective because it did not "show that the defendant made use of reasonable diligence to make himself acquainted with the matters in respect of which the fraud is claimed, nor when or how he repudiated the contract."

And after referring to *Oakes vs. Turquand* and other English cases in which it had been held that the defrauded shareholder must make application to have his name removed from the register of shareholders before winding-up proceedings are instituted against the company, he says:

"These decisions are doubtless in some degree influenced by the special provisions of the Companies Act, particularly that of 1862, but the general course of reasoning therein is applicable to cases of insolvent or bankrupt corporations in this country. There is no register of stockholders in Illinois provided for, and it is possible that the decisions in England requiring active steps by bill in Chancery to have one's name removed from the register might not be applicable to their full extent here. Indeed, I am inclined to the opinion that if a company has fraudulently misrepresented or concealed material facts, and thus drawn an innocent person into the purchase of stock, he at the time being guilty of no want of reasonable caution and judgment, and afterwards guilty of no laches in discovering the fraud, and he thereupon repudiates the contract and offers to rescind the purchase, these facts concurring, I am inclined to the opinion that the bankruptcy of the company subsequently happening will not enable the assignee to insist that the purchase of stock is binding upon him."

We may also refer to *Farrar vs. Walker, Assignee*, before Mr. Justice MILLER, on appeal to the Circuit Court and reported in 3 *Dillon*, in which that learned Judge recognizes in express terms the right of the defrauded shareholder to repudiate the contract, and to repudiate it even after the insolvency of the company, if he has not had reasonable time in which to examine into the affairs of the company before the appointment of the assignee.

We agree that the assets of an insolvent corporation constitute a trust fund, for the payment of corporate debts, and that unpaid subscriptions to its capital stock constitute part of such assets, but the subscriptions must be such as the assignee can enforce according to the well settled principles of law. And if it be conceded that a defrauded shareholder may rescind the contract by a proceeding against the company, instituted before its insolvency, it can make no difference to creditors who have dealt with and have given credit to the company upon the faith of the subscription, whether the contract is *rescinded by a proceeding against the company or by any act or acts of the shareholder which in law amount to a rescission.* In either case the assets of the company will be diminished to the extent of the fraudulent subscriptions.

If, therefore, the defendant's subscription was procured through the false representations of the company, and there was no laches or unreasonable delay on his part in discovering the fraud, and within a reasonable time after the discovery of the fraud, and before the execution of the deed conveying its property in trust for the benefit of its creditors, he notified the corporate authorities that he repudiated the contract, these facts if found by the jury constitute a valid defence to the action. And, this being so, there was error in granting the plaintiff's first and second prayers. We see no

objection to the defendant's third and fourth prayers, except in this particular, they do not leave to the jury to find whether he had used reasonable diligence in discovering the fraud. As these prayers, thus amended, present the law as applicable to the case, it is quite unnecessary to consider the fifth prayer which was rejected by the Court.

*Judgment reversed, and*
*new trial awarded.*

(Decided 1st February, 1894.)