BOSTON FEAR *vs.* J. KEMP BARTLETT, JR., Trustee of the VALLEY LAND and IMPROVEMENT COMPANY.

*Corporations—Subscription to Capital Stock obtained by Fraud—Right of Subscriber to avoid the same before the Insolvency of the Company—Ratification of Subscription—Contract to be Performed in another State.*

If a party is induced to subscribe for shares of the stock of a corporation upon the faith of certain representations contained in a prospectus issued by the company, which representations are false, and within a reasonable time after the discovery of the fraud, and before the insolvency of the company, he notifies the company that he repudiates the contract, these facts constitute a valid defence to an action to recover the subscription.

The subscriber to the stock is released in such case because he has exercised his right to avoid a contract obtained by fraud. The subsequent insolvency of the corporation does not make him liable on such a contract, and the equities of the creditors of the company are not superior to his own.

*Quaere:* Whether the subscriber could repudiate a subscription obtained by the fraud of the corporation after its insolvency, when he had no opportunity of becoming aware of the fraud prior thereto.

The doctrine that unpaid subscriptions to the capital stock of a corporation are a trust fund for the benefit of its creditors, does not apply so as to prevent a defrauded shareholder from rescinding his contract before proceedings in insolvency have been instituted against the company, or what is regarded in law as an act of insolvency committed.

Defendant's contract of subscription was made in July, 1890. Two months thereafter, upon discovering the alleged fraud, he repudiated the subscription. A year afterwards defendant paid to a director of the company one thousand dollars, "in order to save what he had already paid," but at the same time declared that he did not intend to make any further payment on his subscription. Defendant was unable to read or write. *Held,* that under these circumstances, such payment could not be treated as amounting to a ratification of the contract of subscription.

Appeal from the Court of Common Pleas. At the trial the plaintiff offered the following prayers:

*Plaintiff's 1st Prayer.*—The plaintiff prays the Court to declare that upon the testimony of the defendant himself,. there was no such repudiation of the contract of the defendant as a stockholder of the Valley Land and Improvement Company as to discharge him from liabilities as such stockholder in this suit. (Granted.)

*Plaintiff's 2nd Prayer.*—The plaintiff prays the Court to declare that the defendant having admitted that he signed the subscription contract offered in evidence, for fifty shares of the capital stock of the Valley Land and Improvement Company, of the par value of one hundred dollars each, and that he paid and received the certificate of payment of two thousand dollars on account of said shares, then the defendant became a stockholder of said company, and the company had his authority to register his name upon its books as a stockholder of said shares of its capital stock; and it being admitted that while the defendant's name was so registered the company incurred a large amount of indebtedness, which yet remains due and unpaid, and which it is unable to pay without recourse to the liability of its stockholders, then, by force of the unwritten law of Virginia, as shown by the decisions of the Supreme Court of Appeals of Virginia offered in evidence, and by force of the decrees of the Circuit Court for Page County and the deed of trust offered in evidence, the plaintiff is entitled to recover in this suit, notwithstanding the Court shall further find that after the company incurred such indebtedness, which still remains unpaid, the defendant attempted to repudiate his subscription, as testified to by him. (Granted.)

*Plaintiff's 3rd Prayer.*—The plaintiff prays the Court to declare that the defendant having admitted that he signed the subscription contract offered in evidence for fifty shares of the capital stock of the Valley Land and Improvement Company of the par value of one hundred dollars each, and

that he paid and received the certificate of the payment of two thousand dollars on account of said shares, then the defendant became a stockholder of said company, and the company had his authority to register his name upon its books as a stockholder of said shares of its capital stock ; and it being admitted that while the defendant's name was so registered, the company incurred a large amount of indebtedness which yet remains due and unpaid, and which it is unable to pay without recourse to the liability of its stockholders, then by force of the decrees of the Circuit Court for Page County, and the deed of trust offered in evidence, the plaintiff is entitled to recover in this suit, notwithstanding the Court shall further find that after the company incurred said indebtedness, which still remains unpaid, the defendant attempted to repudiate his subscription, as testified to by him.   (Granted.)

And the defendant offered the three following prayers :

*Defendant's 1st Prayer.*—If the Court finds from the evidence that the defendant contracted with the Valley Land and Improvement Company to purchase fifty shares of the capital stock for the sum of five thousand dollars, and paid two thousand dollars on account thereof on the day of said purchase, on July 11th, 1890, that said contract was made with J. D. Wheeler, the company's agent, and that the defendant was induced to make said contract upon the representations contained in the printed prospectus of the said company, which has been offered in evidence, and said company delivered to the defendant, through said agent, the receipt for the two thousand dollars so paid, signed by said Wheeler, which has also been offered in evidence, is the same, or a copy of the same exhibited by the said Wheeler to the defendant at the time of said contract of sale and of said stock; and if the Court shall further find that said prospectus contained fraudulent and material misrepresentations of facts which were calculated to induce subscriptions to stock, and that the defendant, by reason of said false statements, was induced to subscribe to the said

fifty shares of stock; and if the Court shall further find
that in the fall of 1890, and subsequent to the public sale
of lots in September, 1890, and while the company was
still conducting business through its officers, the defendant
notified the said Wheeler, the company's agent, and also
notified Levi Z. Condon, one of the directors of the said
company, prior to January 1st, 1891, that he had heard
that the said company was a swindle and fraud, and that he
would have nothing more to do with it, and would pay no
more money on his stock subscriptions; and shall further
find that he did so because he learned that the company
did not own the lands represented to him that it owned,
and of other misrepresentations, and that said notice was
given within a reasonable time after he had learned of said
misrepresentations; and further find that the defendant was
and is now a citizen of Maryland, then the verdict must be
for the defendant.    (Rejected.)

*Defendant's 2nd Prayer.*—If the Court shall find that the
prospectus offered in evidence had been exhibited by
the agent or agents of the Valley Land and Improve-
ment Company to the defendant, or that the said state-
ments offered in evidence as to the ownership of the
caves and mineral property, &c., as testified to by the
defendant, before any contract was entered into between
said company and him were made with a view to in-
duce him to take the stock mentioned in the evidence,
and that said prospectus formed part of the contract with
reference to said stock, between said company and
the defendant, and that when said contract was made
said company did not own and control the Luray
Inn and Caverns, or had not acquired about twenty-five
hundred acres of the choicest land for building sites and
manufacturing purposes, or did not own or control about
eight thousand acres of the best mineral property in Vir-
ginia, consisting of iron, manganese and other valuable
minerals, or shall find that it is untrue to any material ex-
tent that the books of subscription of sale of said stock

were hardly opened when one hundred thousand dollars were subscribed, and that the defendant heard prior and after the lot sale, circumstances putting him on enquiry as to said misrepresentations contained in · said prospectus, in any of the above-mentioned particulars, he called on J. D. Wheeler, the company's agent, and notified him that he would no longer be bound by said contract, or make further payments thereon, and gave Levi Z. Condon, as agent and director of said company, such a notice before January 6th, 1891 ; and shall further find that when such notice was given, the said company was a going concern, engaged in the conduct of its business by its own officers, and that the defendant did give said notice within reasonable time after discovering said misrepresentations, and also that the defendant was then and still is a citizen of Maryland, then the verdict ought to be for the defendant.   (Rejected.)

*Defendant's 3rd Prayer.*—The defendant prays the Court to exclude from this case all evidence tending to show what is the unwritten or written law of the State of Virginia as to the rights of subscribers to the capital stock of its corporations to repudiate said subscription, because the same is not applicable to this case.   (Rejected.)

The Court below (DOBLER, J.), before whom the case was tried by agreement without a jury, granted the plaintiff's prayers and rejected the defendant's prayers, and from the judgment in favor of the plaintiff for $1,650, the defendant appealed.

The cause was argued before ROBINSON, C. J., BRYAN, McSHERRY, BRISCOE, PAGE and BOYD, JJ.

*R. B. Tippett* (with whom was *Jas. E. Tippett* on the brief), for the appellant.

*John P. Poe, Attorney-General,* and *Joseph C. France* (with whom was *Charles Marshall* on the brief), for the appellee.

Conceding for the argument that the defendant was misled by a material, untrue statement in the prospectus, and that

in due time he disaffirmed the contract, then it is clear that his defence would be a good one in any suit brought by the *eompany*.   But the company having become insolvent, and the demand for payment being made by a trustee appointed to collect the unpaid subscriptions for the purpose of paying therewith the company's debts—whose equity is stronger, that of the innocent creditor, or that of the defrauded subscriber?   A corporation can have nothing but what it acquired through its stock subscriptions; a creditor can therefore look to nothing but these.   Suppose he actually examines the company's stock ledger, and finding that subscribers, of whose solvency he is sure, still owe the company, lends his money in good faith before such subscribers have disaffirmed—who· has the stronger right?   A fraudulent contract is only voidable; when repudiated it becomes void, not from the date of its making, but from the date of its disaffirmance.   Following this principle, the decisions are as follows:

In England, where and because a system of publicly registering the names of stockholders prevails, a defrauded stockholder must institute public proceedings for the purpose of having his name removed from the list, if the company refuses so to remove upon demand.   In this country there is no such system and no such requirement.   A repudiation distinctly made to the company or to any authorized agent ends the matter, if the rights of third parties are not involved.   In England, any one whose name has not been removed from the registry before the time of winding up, or even before insolvency, must contribute to pay creditors, even if defrauded into his subscription.   But it is a mistake to conclude that this rule is based upon the requirements of the public registry system; the rule was laid down in the often quoted case of *Oakes* v. *Turquand*, L. R. 2 H. L. 325, but in the latter case of *Stone* v. *The City and County Bank*, 3 C. P. Division, 283; the Court (BRAMWELL, L. J.), in commenting on *Oakes* v. *Turquand*, says that a stockholder's liability arises, not from estoppel, but " depends upon a prin-

ciple similar to that upon which the decision in *Kingsford* v. *Merry* proceeded. It was there held that if the owner of goods sells them, owing to a fraudulent representation, and before he discovers the fraud another person acquires some claim to them, he cannot afterward rescind the contract."

Now, while we have in this country no registry system, nevertheless, there are two rules growing out of the decisions, which, in a measure, supply its place. These are, (1st), a creditor is conclusively presumed to give credit to a corporation upon the faith of its stock subscriptions, and (2d), the creditor is conclusively presumed to know in reference to the names of the subscribers and the amounts due by them, that which an examination of the company's books at the time of giving the credit would disclose. *Handley* v. *Stutz*, 139 U. S. 509. "Whatever may be the law between the delinquent subscriber and the corporation, the rights and equities of corporate creditors are not to be thereby affected." *Rider* v. *Morrison*, 54 Md. 429 ; *Crawford* v. *Rohrer*, 59 Md. 604. "A defrauded stockholder must notify the company and claim rescission before they incur liabilities on the faith of his contract." *Cunningham* v. *Edgefield R. R. Co.* 2 Head (Tenn.) 23 ; *Chubb* v. *Upton*, 95 U. S. 665. "One who has been induced to subscribe for corporate stock by fraudulent representations, cannot recover the amount paid until the claims of creditors are satisfied," "although the fraud was not discovered until after insolvency." *Turner* v. *Grangers' Co.*, 65 Ga. 649. See also *Upton* v. *Hansbro*, 3 Bissell, C. C. 425 ; *Chubb* v. *Upton*, 95 U. S. 665 ; *Howard* v. *Glenn*, 11 S. E. R. 610 ; *McDermott* v. *Harris*, 9 N. Y. 184 ; *Weisiger* v. *Richmond Ice Co.* (Va., Nov., 1894.)

ROBINSON, C. J., delivered the opinion of the Court.

The plaintiff is the Trustee of the Valley Land and Improvement Company, chartered by the State of Virginia, and this is a suit to enforce the payment of the defendant's subscription to the capital stock of the company. The de-

fence is that the defendant was induced to become a sub-
scriber on the faith of certain representations set forth in a
*prospectus issued by the company*; that these representations
were false and fraudulent, and that the defendant, as soon
as he became or could by reasonable diligence become
aware of the fraud, and before the insolvency of the com-
pany, repudiated his contract of subscription and so notified
the company.

The defence is substantially the same as that relied on in
*Bartlett, Trustee,* v. *Savage,* 78 Md. 561, in a suit by the
present plaintiff against the defendant in that case to recover
his subscription to the stock of the same company. And
in that case we said that if the defendant was induced to be-
come a shareholder on the faith of certain representations
contained in a prospectus issued by the company, and that
these representations were false, and that within a reason-
able time after the discovery of the fraud, and before the in-
solvency of the company, he repudiated his contract of
subscription and so notified the company, these facts, if
found by the jury, constituted a valid defense to the action.

The counsel for the appellee did not seem to think we
had gone so far in that case, and in view of the fact that
there are a number of other suits in the Court below in-
volving the same defence, the question has again been fully
argued and fully considered by us ; and we see no reason
to modify or qualify in the least the judgment in the Savage
case.   We cannot agree that it is in any manner in conflict
with what is known as *the trust fund doctrine*, now recog-
nized in this country.   This doctrine, it has been said, was
first announced in *Wood's case*, 3 Mason, 308, where the
stockholders of a bank divided among themselves two-
thirds of its capital stock, without leaving sufficient funds
to pay its creditors, and MR. JUSTICE STORY held, and justly
held, that the property of the bank must first be applied to
the payment of its creditors, before there could be any dis-
tribution of its assets among the stockholders.   And the
most emphatic enunciation of the doctrine is to be found in

the opinion of Mr. Justice Miller, in *Sawyer* v. *Hoag*, 17
Wallace, 610, where a stockholder of an insurance com-
pany having given his note for his subscription to its capital
stock, after the insolvency of the company and with full
knowledge of its insolvency bought up claims against the
company for one-third their face value, and then set up
these claims as a set-off to his unpaid subscription.

But whatever may have been the origin of the doctrine,
it means and can only mean, that when a corporation has
been lawfully dissolved or has become insolvent, its entire
property, including unpaid subscriptions to its capital stock,
becomes a trust fund for the payment of its debts, and that
creditors are entitled in equity to have their debts paid out
of the assets of the company before there can be any dis-
tribution among the stockholders. *Fogg* v. *Blair*, 133 U. S.
534; *Railroad Co.* v. *Ham.* 114 U. S. 587; *Brandt* v. *Ehlen*,
59 Md. 1. And no one can question the justice and sound
sense of the doctrine as thus understood. But it is only
when the company has been dissolved or has become insol-
vent that this equitable doctrine arises. So long as the
company is a going concern, having the possession and
management of its property, contracts made by and with the
company are governed by the same principles of law as con-
tracts between individuals. And such being the case, if
one is induced to become a subscriber to its capital stock
by the fraud of the company and within a reasonable time
after the discovery of the fraud, there being no laches on
his part in discovering the fraud, repudiates his subscription,
and this too before the insolvency of the company, under
such circumstances he is, according to the settled law of this
country, relieved of all liability on account of his subscription.
He is relieved because he has the right to avoid a fraudulent
contract, and because he has exercised this right. The
subsequent insolvency of the company can upon no principle
make him liable on a fraudulent contract which he has thus
repudiated. And under such circumstances we cannot agree
that the equities of the creditor are superior to those of the

defrauded shareholder. Whether the subscriber could repudiate his subscription obtained by the fraud of the company after its insolvency, when he had no opportunity of becoming aware of the fraud before the insolvency, is a question in regard to which we are not to be understood as expressing any opinion. For the authorities in support of the views we have expressed, we may refer to *Savage's case*, 78 Md. 561.

And even in England, where the Companies Act of 1862, provides for the appointment of a public officer, whose duty it is to register the name, the capital stock, together with a statement as to the object and purposes of every company or corporation, with the names, addresses and number of shares taken by each subscriber, and the amount paid on each share, which register is open to the inspection of all persons, and which further provides, that every subscriber whose name appears upon the register shall, upon the winding up of the company, contribute to the payment of its debts, even under this Act it is now well-settled that a shareholder, whose subscription was obtained by fraud, may rescind the contract before the insolvency of the company. *Reese River Mining Company* v. *Smith*, L. R. 4, H. L. 64.

And when we speak of the right of the defrauded shareholder to rescind his contract before the insolvency of the company, we mean before proceedings in insolvency voluntary or involuntary have been instituted, or some act done that in law is regarded as an act of insolvency, for until then the trust fund doctrine relied on by the appellee has no application. *Graham* v. *Railroad Company*, 102 U. S. 148.

It follows from what we have said there was error in granting the second and third prayers of the plaintiff and in refusing to grant the defendant's second and third prayers. And there was error also in granting the plaintiff's first prayer, that upon the testimony of the defendant himself there was no such repudiation of his contract as to discharge him from liability. We agree that it was incumbent on the defendant to repudiate his contract within a reason-

able time after the discovery of the fraud, and we agree, too, it must be a real and not a pretended repudiation, and we agree, too, that what amounts to a repudiation must largely depend upon the facts and circumstances of each particular case. Now, in this case, the defendant's subscription was made in July, 1890, and there is proof tending to show that early in September of the same year, two months after the subscription, upon discovering the fraud alleged to have been practised upon him, he at once repudiated his contract of subscription.

Now it appears that in September of the next year Mr. Condon, one of the directors of the company, and who had been somewhat instrumental in getting the defendant to subscribe for the stock in question, called on the defendant and told him there was more trouble at Luray and that he wanted to get ten thousand dollars to save the property of the company, and that he had paid five thousand dollars in cash on account of his stock, and wanted to try and save what he had paid. To this the defendant replied : " I will never give another dollar towards that subscription to the stock." After some further conversation the defendant said he was willing to give a thousand dollars to save what he had already paid on his subscription, and thereupon gave to Condon his cheque for that amount. But all through his testimony the defendant insisted that the amount thus paid by him was contributed solely for the purpose of saving the two thousand dollars paid by him at the time of his subscription, and was never meant or intended as a further payment on account of such subscription. The defendant is, it appears, unable to read or write, and it would be unfair, under all these circumstances, to say that the thousand dollars thus paid by him is to be treated as amounting in law to an affirmation of his subscription, especially in view of his declarations made at the time it was paid that he never would pay another dollar on account of his subscription.

In dealing with the defendant's subscription, we have

treated it as a Virginia contract.   The company was char-
tered by that State, with its office and place of business in
that State, and although the subscription was made in this
State, the contract was to be performed in Virginia.   And
this being so, the rights and liabilities of the parties under
it are to be determined by the law of that State.   And what
we have said as to the right of the defendant to repudiate
his subscription on the ground that it was procured through
the fraud of the company, is strictly in accord with decision
of the Court of Appeals of that State in *Weisiger and
others* v. *Richmond Ice Machine Company*, 90 Va. 795.

> *Judgment reversed and new trial
> awarded.*