# LILLIAN B. HODSON *vs.* HARRY E. KARR ET AL., RECEIVERS.

*Sales by Insolvent—Dealings Held Not to Constitute Illegal Preferences.*

Sales of property made by an insolvent are not invalid provided his dealings with his property were not designed to give a preference to any particular creditor or to hinder and delay other creditors.

A corporation which was carrying on business with insufficient capital adopted the plan of selling for cash to third parties bills of exchange, or orders on the purchasers of its goods directing them to pay the amounts due to the company to the holders of the drafts. The appellant became the purchaser of such drafts from the company by paying for them in cash by her own checks. The books of the company did not show any tranaction between it and the buyers of drafts, except when there were mistakes or discrepancies. On two or three occasions the appellant

agreed to buy such drafts and paid for the same, but they were not delivered to her on that day in full, and she also paid on one occasion for drafts to a greater amount than were delivered, and her money was afterwards refunded. As to these transactions the books of the company showed that she was a creditor of the company as to such payments for a few days, until the account was balanced. Upon the insolvency of the company, when receivers were appointed, it was claimed that such payments to the appellant were illegal preferences. *Held*, that these payments were not preferences, or the repayment of loans made by the appellant to the company, but merely the refunding of money paid for drafts which the company had agreed to deliver for such money, but was unable to do so, and that the dealings between the company and the appellant did not operate to the prejudice of the former's creditors.

Appeal from the Circuit Court No. 2, of Baltimore City (WICKES, J.)

The cause was argued before McSHERRY, C. J., FOWLER, BRISCOE, PAGE, BOYD, SCHMUCKER and JONES, JJ.

*Thos. S. Hodson*, for the appellant.

*Carville D. Benson*, for the appellees.

PAGE, J., delivered the opinion of the Court.

This appeal is from a decree of the lower Court granted upon the petitions of the appellant, praying that certain drafts, which she claims, should be delivered to her, by the appellees.

In October, 1900, the appellees were appointed receivers of the Warner & Brown Company, with power to take possession of its property and collect its outstanding claims.

Subsequently, (but at different times) the appellant filed nine petitions, in which she averred that she had purchased, for cash, of the company certain drafts issued by it upon persons who had purchased its goods ; and that the payees therein had sent their checks in payment thereof to the receivers, who still retained possession of them. She thereupon prayed that the receivers might be required to return the checks to the payees, or deliver them to the appellant. In their answers to these petitions the receivers aver that the

books of the Warner & Brown Co., show that from the 4th of September to 6th of October, 1901, the appellant was paid by the company various sums amounting in aggregate to $1,359.49 at a time when her husband, Clarence Hodson, was its financial manager and knew it to be insolvent, and thereby she was made a preferred creditor, and that all of these transactions occurred within four months; wherefore the receivers are entitled to retain the drafts uutil it be determined by the Court whether or not such payments constituted preferences and such drafts were not given to secure money previously loaned to the corporation.

The main question in the case is whether the drafts and money received by her were preferences made to secure money previously loaned by her to the corporation. This requires of us a careful scrutiny into the character of her dealings with the corporation as disclosed by the evidence in the record.

The appellant contends that she was in fact never a creditor of the company, that all her dealings with it were in the relation of purchaser of its drafts, for which she paid in cash, and that her apparent relation as creditor of the company was referable, not to the character of her transactions, but solely to the manner in which the books of the company were kept, for which she was in no wise responsible.

The business of the company was the manufacturing and sale of cigars and cheroots. It sold its products for cash accompanying order, or on draft of the company at sight with two per cent trade discount. It seems to have been short of capital from the start. Its financial manager, Clarence Hodson, testifies, that, "we were practically without money. Orders were piling in, 10,000 to 40,000 cheroots a day, with orders from 200,000 to 300,000 ahead, and we still needed money." He further testifies that money was obtained from personal friends and the banks, until no more could be raised from those sources. It required from nine days to two months to get the cash from their shipments, and except in cases where they received the "cash down by selling exchange," there was no money for the payment of the expenses "for stamps, pay-roll, foil, &c."

In this emergency, a plan for raising money was resorted to of "selling bills of exchange or orders on debtors to pay over to a third party the amounts due from them on account of their purchases, and assigning the same to him, with the company's guarantee of payment." The appellant, having money of her own, with the advice of her husband and attorney, became the purchaser of these drafts, or some of them, upon terms which obliged her to pay for them in cash at the time of their delivery to her by the company. She alleges she did so pay in cash for all she purchased, and as to the greater number this does not seem to be questioned by the appellees. It would seem to be clear that if in fact she did pay cash for the drafts and the only relation between her and the company was that of seller and purchaser for cash, the transactions cannot be questioned. In such case she could not become a creditor of the company and there could be no antecedent debt, the discharge of which would constitute a preference. There could be no good reason why she should not so deal with the company. As long as it retained the possession and management of its property, it could deal with it in the regular course of its business, provided it does not impair the value of its estate by improper preferences and has no purpose to delay or defraud its creditors. *Clark* v. *Islin*, 21 Wall. 360.

The law on this subject, as affected by the Bankrupt Act of the United States in force in 1873, is fully stated by the Supreme Court of the United States in *Cook* v. *Tullis*, 18 Wall. 85 U. S. 340, as follows: "There is nothing in the Bankrupt Act, either in its language or object, which prevents an insolvent from dealing with his property, selling or exchanging it for other property at any time before proceedings in bankruptcy are taken by or against him, provided such dealings be conducted without any purpose to defraud or delay his creditors, or give preference to anyone, and does not impair the value of his estate. An insolvent is not bound in the misfortune of his insolvency to abandon all dealings with his property; his creditors can only complain if he wastes his

estate, or gives preferences in its disposition to one over another. His dealings will stand if it leave his estate in as good plight and condition as previously." These considerations apply with equal force to the provisions of the insolvent law of this State. Conceding, but not deciding, that it is still in full force, its provisions do not contemplate that any act of the debtor can amount to a preference, unless it operates to diminish the estate or confers upon one creditor over another some advantage in the disposition of its estate. The preferences it denounces are those which secure or pay an antecedent debt. *Nicholson* v. *Schmucker*, 81 Md. 464. And there is nothing in its provisions or its object which will prevent a person in the possession and management of his property from dealing with it in the usual course of his business, provided he acts *bona fide* and does nothing to delay or defraud his creditors or any of them or to impair the value of his estate and so deprive his creditors of their proportionate shares in its disposition. The same rule applies to insolvent corporations. *Fear* v. *Barlett*, 81 Md. 443. By the 264A section of Article 23 of the Code, only those payments or other acts are void, that would have been void or fraudulent if the same had been made by a natural person under Article 47.

Out of the entire number of purchases of drafts by the appellant, amounting in all to about seventy-five, only a few are specially brought in question. The receivers, it is true, claim in the brief that all the credits of money to the appellant on the company's books, amounting in the aggregate to $1,359.49 are illegal preferences, but they have assigned special reasons, only as to six items. These we will now examine.

The first bears date the fourth of September for $170.50. Before entering upon the examination of this and other entries in the ledger of the company it must be borne in mind, that by the method of its book-keeping, when a draft was drawn on a purchaser, his account was credited with the amount of the invoice thus closing the account and the draft was then considered as belonging to the "party who had bought" it.

No account was kept between the company and the purchasers of these drafts in the company's books, except in cases where there were such mistakes or discrepancies as rendered it necessary for the protection of the company that special entries should be made.  For this reason but a small part of the appellant's transactions with the company appear on its books ; and even where there are entries, they are often insufficient to explain much that actually took place.  It must be said also with reference to the testimony of Miss Miller that she seems to have but little if any information except what the books disclose.  She was the book-keeper of the company and was probably supplied with such information as she required to perform her duty.  Her testimony is a mere explanation of the entries in the books and she does not pretend to state what was the real nature of the several transactions, as between the company and the appellant.  She does indeed testify as to the habit of the appellant in purchasing drafts of the company and in respect of the entries in the books of the company, but she knows nothing of the special agreement between the appellant and the company.  In fact, the only person who possessed such knowledge so far as we are informed, was the financial manager, Clarence Hodson, and it is upon his testimony we must rely, in respect of these matters.

The explanation of this witness (and there is nothing in the record to contradict it) is, that on September 3rd the appellant paid the proceeds of a draft, $52.92, over to the company, for which it was to deliver her other drafts.   On the 4th she purchased and paid for drafts aggregating $117.60, total paid in on the two days $170.52.   The company not being able to make good its delivery of drafts on that evening, simply returned her money.   The transactions of September 9th, 10th, 11th and 16th may be similarly explained.   The appellant paid (proceeds of draft) the sum of $463.44 on the 9th to be repaid in drafts of the company, and on the 11th she handed in the sum of $169.00 for the same purpose.  In return drafts netting $168.78 were delivered to her on the 9th.   On the

10th other drafts for $298.28 and residue, being $171.11 was returned to her out of the proceeds of her own check. It thus appears that in each of the transactions we have gone over, the parties did not intend that the relation of debtor and creditor should exist between them, or that they should occupy any other relation to each other than that of seller and purchaser of the company's drafts on its purchasers. And though in some instances the transactions do not seem to have been closed at the moment they were undertaken, yet substantially that was the case and any balances that remained over night were not intended to constitute loans from one to the other. At no time were the company's assets diminished, nor did the company perform any act that it was not in good faith bound to do, by the agreement under which it was for a night in the attitude of a creditor. The learned Judge who decided the case below found in these particular transactions nothing that constituted them preferences, and in this we concur with him.

The decree which has been appealed from declares that the transactions of October the second and fifth did create preferences, and for this reason, they must also be examined.

The entries on the company's book are as follows:

| Oct. 2. To cash, 60 . . $200 00 | Sept. 28. By cash . . $294 00 . |
| Oct. 5.  "   "   60 . .  294 00 |    "    30.  "    "   . .  200 00 |
| $494 00 | $494 00 |

On its face this appears to be an advance to the company in September of $494.00 and the repayment of the amount in October. But in the light of the evidence before us we think it susceptible of a different interpretation. As appears from the entries the appellant paid to the company by her two checks the sum of $494.00. It was paid $294.00 on September 28th, and on that day the company was to deliver her an equal amount in drafts on purchasers. It was paid in therefore as her part of what was intended to be a cash transaction. But on that day, being Saturday, the company, for reasons that appear in the testimony, was unable to make delivery, and the matter went over until Monday the 30th. On the last-men-

tioned day the company to carry out its part of the agreement delivered her drafts for $209.52 and on Tuesday additional drafts for $270.63 for which she handed in $270.63. She had thus paid in for drafts delivered and to be delivered, an aggregate amount of $974.15. Not being able to deliver more drafts, or for some other reasons, the balance was returned by the checks of the company for $494.00, which the company was enabled to do by using the proceeds of her own checks; or in other terms, the company delivered to her all the drafts they had the power to do, and returned to her, her own money for the balance. There is here not an element of a preference. In fact the money paid to her on the 2nd and 5th of October was her own and did not belong to the company. It was not the payment of a debt, but merely an act of good faith, by which the company being unable to perform the duty resting upon it, for which it received the funds, returned her own money to the owner. The transactions caused no abatement of the assets of the company nor were the creditors in anywise affected by them, except favorably, in that the company obtained some aid by the sales it made of its drafts. It thereby secured money, of which they were sorely in need, for the prosecution of its business. We are therefore of the opinion that the decree was erroneous so far as it declared " this amount was a preference."

There were other matters argued, but inasmuch as the appellant in our view will be entitled to receive the proceeds of all the drafts named in the several petitions (except the draft on A. M. Frank for $51.45), they do not now need our attention.

The decree must therefore be reversed in part and affirmed in part, and cause remanded, with costs to the appellant Lillian B. Hodson.

*Reversed in part and affirmed in part,*
*with costs to appellant, and cause*
*remanded.*

(Decided January 23rd, 1903.)