## C. J. HINKLEY v. SAC OIL AND PIPE LINE Co. and H. W. PETERSMEYER, Appellants.

**Corporations:** PROMOTORS: LIABILITY FOR SERVICES. Promotors who render services in the organization of a corporation with no view to compensation cannot after organization enforce payment for services.

**Organization:** FRAUD OF PROMOTORS. Promotors of a corporation are required to act in the utmost good faith toward those who subscribe for stock; and a scheme whereby the promotors secretly acquire a controlling interest in the corporation without paying any consideration therefor is a fraud upon the *bona fide* subscribers to stock.

**Same.** Subscribers to the stock of a corporation have the right to asume, in the absence of knowledge of the contrary, that all other holders of stock paid the same price therefor.

**Directors:** FIDUCIARY RELATIONS. The directors of a corporation are trustees for the stock-holders to whom they owe the utmost good faith in the management of the corporate business.

**Gratuitous issuance of stock:** FRAUD. The gratuitous issuance of corporate stock to some of the stockholders is a fraud upon existing and subsequent purchasers for value and creditors who deal with the corporation on the good faith of its capital stock, and cannot be justified on the ground of a belief that all stock would attain a par value, or that the gratuitous holders guaranteed corporate indebtedness, contemplating at the time repayment by the company.

**Same:** FRAUDULENT CONCEALMENT. The directors of a corporation who fail to disclose to subsequent purchasers the fact that they are the gratuitous holders of a majority of the stock secretly acquired, are guilty of fraudulent concealment for which they are liable in damages.

**False statements.** The statement that corporate stock is paid up and nonassessable, though merely expressive of an opinion, will not obviate the further misstatement that the same is fully paid.

**Same:** One purchasing corporate stock at less than par value is not prejudiced by the representation, though false, that it is paid up and non assessable.

**Same:** CORPORATE LIABILITY. The false representations of a director to a purchaser of stock, that the promoters of the corporation had paid a stated sum for the stock held by them, will entitle him to recover the sum he was thereby induced to pay for his stock.

**Parol evidence of fraud:** VARIANCE OF WRITING. Parol evidence of fraudulent representations, made as an inducement and at the time of entering into a written contract, is not objectionable as tending to vary the terms of the writing.

**Fraudulent sale of corporate stock:** KNOWLEDGE OF FRAUD: EVIDENCE. In an action by a stockholder to recover the amount paid for his stock and to cancel the same on the ground of fraud, the evidence of his knowledge of the affairs of the corporation is held insufficient to have enabled plaintiff to have sooner detected the fraud; and he is not therefore estopped by his laches to maintain the action.

**Cancellation of stock:** INSOLVENCY OF CORPORATION: RIGHT OF ACTION. A stockholder may maintain an action to cancel his stock and recover the amount paid therefor on the ground of fraud, notwithstanding the insolvency of the corporation, where he was diligent in discovering the fraud, unless proceedings in insolvency have been instituted or some act committed which would amount to insolvency.

*Appeal from Sac District Court.*— HON. F. M. POWERS, Judge.

SATURDAY, MAY 19, 1906.

REHEARING DENIED, WEDNESDAY, NOVEMBER 21, 1906.

ACTION for the amount paid for stock in the defendant company and to cancel said stock. Judgment and decree as prayed. The defendants appeal. *Affirmed.*

*Will E. Johnston* and *J. B. McCrary,* for appellants.

*W. A. Helsell,* for appellee.

LADD, J.— Early in the year 1902 the defendant Petersmeyer and nine others met in Odebolt, Iowa, and there and

then concocted a scheme by which a company was to be organized to engage in some enterprise, the means of which should be obtained by the sale of stock therein to the public, and of that remaining enough should be issued to themselves gratuitously to give them the control of its affairs. In pursuance of this design each contributed a few dollars to a fund out of which the expenses were borne of one of them to investigate the prospects of zinc mining in Arkansas and of another to ascertain the situation with respect to the discovery of oil in Texas. The report of the latter proved the more enticing, and as a result the Sac Oil & Pipe Line Company was incorporated under the laws of Arizona, to be operated in Iowa, for the purpose of engaging in the oil business in Texas. The capital stock was divided into 499,999 shares, of the par value of $1 each, and a few of these were issued to each of the promoters to enable them to elect eight of their number to serve as directors and officers of the company. Some days later the directors met and resolved to " accept from C. H. Smith, of Odebolt, Iowa (one of their number), a certain contract made between R. L. Cox & Co., of Beaumont, Tex., under date of March 19, 1902, for the purchase of a certain block of land located in the Hogg-Swayne subdivision of blocks 36, 37, and 38, located on Spindle Top Heights, near Beaumont, Tex." This contract had been brought back by the representative who had gone to Texas. Neither he nor Smith had paid anything for it. While it purported to bind Smith, there is no dispute but that it was entered into with the intention of assigning it to some company to be formed upon which by its terms he should be released, and it was not to be enforced against him. In other words it amounted to no more than an option prior to its assignment. As assignee the company assumed the obligation of paying the entire purchase price. By the terms of this contract Cox & Co. agreed to convey 1-64, acre of land, the deed to be left with a bank at Beaumont, Tex., in escrow to be delivered upon the payment of the purchase .

price of $15,000.   The company was to deposit $2,000 with
the same bank, to be paid to Cox & Co. upon the completion
and acceptance of an oil well of average producing capacity,
six inches in diameter, piped and domed, all to be done within
ninety days after such deposit.   Cox & Co. also agreed to
sell interests in their pipe lines to the railway and that to
be constructed to Port Arthur at prices stated therein, and
to sell oil which would net $4,500 or " the proportionate
amount thereof " in part payment of the well; to loan oil
to supply demands until the well should be completed which
should be repaid therefrom.   Upon acceptance of the well
payments were to follow at short intervals.   The contract
named $30,000 as the price, but the additional sum was
inserted to enable the assignor to obtain a " margin " for his
" services."

It was further resolved by the board of directors:

That this corporation issue to C. H. Smith, in considera-
tion of said contract, 499,989 shares of capital stock of this
corporation on the condition that he surrender back to this
corporation 250,989 shares, which may be used by the cor-
poration to be sold at such price as the board of directors
may so elect from time to time for the purpose of carrying
out further promotions of this company; further, that 210,-
000 shares of the stock so issued to C. H. Smith be his
stock, which he is allowed to allot to such parties as assisted
him in the purchase of the above contract and on the condi-
tion that the balance, 39,000 shares, be turned over to the
company for the purpose of being sold by them at a less
price than the treasury stock will be sold by the corporation.
It is to be understood that the 39,000 shares being sold at
a less price than the regular stock will be sold, is for the
purpose of getting in some outside assistance if the company
sees that it is absolutely necessary.   And on the 1st day of
August, 1902, whatever amount of the 39,000 shares is not
sold or whatever part may be left of it, and still in the hands
of the corporation shall revert back to the said C. H. Smith
which he may divide among the said parties who assisted him
in the purchase of the above said contract.   On motion, a

block of 75,000 shares of the treasury stock of this corporation shall be placed upon the market to be sold at 25 cents per share subject to the call of the board of directors. On motion, the president and secretary were authorized to prepare suitable subscription blanks as they deem necessary for the business of the corporation.

The object of this manipulation was to render the stock paid up and nonassessable. It was issued as directed, and Smith transferred the two hundred and fifty thousand nine hundred and eighty-nine shares back to the company as treasury stock, so-called. By the men who assisted Smith was meant the other nine promoters of the company. All but about twenty-five thousand of the two hundred and ten thousand shares were distributed to the promoters gratuitously. While they may have advanced a little money, and given some for the promotion of the company, no stock was issued in payment thereof. Nor were the advancements made or services rendered with a view to their return or compensation therefor by the corporation when organized. In these circumstances compensation by the company could not have been enforced. *Low v. Connecticut R. Co.,* 45 N. H. 370; *Marchand v. Loan, etc., Ass'n.,* 26 La. Ann. 389; *Perry v. Little Rock, etc., R. Co.,* 44 Ark. 383; 10 *Cyc.* 264; Thompson, Corp., section 486. See *Bell's Gap R. Co. v. Christy,* 79 Pa. 54 (21 Am. Rep. 39). The portion of Petersmeyer was fifteen thousand one hundred shares. Fifty-six thousand nine hundred shares of treasury stock were disposed of at twenty-five cents a share. Much of this, if not all, was sold by the promoters acting for the company on applications similar to that signed by the plaintiff. It, with part of the printed matter, may be set out:

1. CORPORATIONS: promoters: liability for services.

Original: Money returned unless a gusher is brought in. J. W. Jackson, secretary, Lake City, Iowa. No. 70. I hereby subscribe for 1,000 shares of the capital stock of the Sac Oil & Pipe Line Co., at 25 cents a share, par value $1.00 full paid and nonassessable. In payment therefor I

remit $—— or deposit $250.00 in the Farmers' National Bank of Odebolt to be held by said bank until a flowing oil well of 40,000 to 80,000 barrels capacity per day is brought in on the company's property on Spindle Top Heights near Beaumont, Texas. Should no gusher be brought in within six months from date this money will be returned. Name: C. J. Hinkley. P. O. address: Odebolt, Iowa.

Accepted June 5, 1902. Sac Oil & Pipe Line Company, J. W. Jackson.

This order should be signed in duplicate. If you remit, one will be returned to you. If you deposit amount in your local bank, we return the duplicate to your bank to be held in trust. When accepted this is an agreement binding the company to deliver the shares or return the money. Stock will be advanced to 50 cents as soon as a gusher is brought in.

In the fore part of June, 1902, satisfactory proof was received that oil had been struck, and that the capacity of the well was from forty to eighty thousand barrels per day, whereupon the plaintiff paid the amount of his subscription and received a certificate of one thousand shares. Prior to this, and on the 6th day of May, the company had contracted for another well at $10,000, of which $1,000 was to be paid when oil was reached and the remaining $9,000 out of the sale of oil to be obtained from the well. By the time proper connections were made and a vat procured oil ceased to flow from the top, and it was necessary to agitate with air, and later to employ a "steam head" and pumps. In this way oil to the value of between $4,000 and $5,000 was taken out. Then water came in, and the price of oil wells went down, so that one witness declared he now had them for sale at ten cents a piece. This somewhat extended statement of facts has seemed essential to a full understanding of the case. The petition is in three counts, in the first of which recovery of the amount paid by plaintiff for his stock is demanded on the ground that there was a conspiracy to defraud the public, the second because of the fraudulent representations and concealment

of defendant Petersmeyer, and the third owing to the non-payment of stock by the promoters. The first two only need be considered.

II. The ten men who planned and organized the defendant company were promoters, within the meaning of the law. The *Telegraph v. Loetscher*, 127 Iowa, 383. A

**2. ORGANIZATION: fraud of promoters.**

promoter is a person who brings about the incorporation and organization of a corporation. This was done by all of them, and with a specific design to defraud any of the public whom they might be able to induce to subscribe for stock. Those of them who were called as witnesses candidly admitted that the scheme adopted at the preliminary meeting was to engage in some enterprise, the costs of which and of its development should be paid solely from the proceeds derived from the sale of stock to others, should cost them nothing, and that enough stock should be issued to themselves so that in event of success they would manage and control the affairs of the corporation. In other words, the plan contemplated: (1) That in event of failure the entire loss would fall upon their neighbours; and (2) that in event of success they would appropriate to their own use without any consideration whatever more than one-half of the profits and property acquired. That this was a conspiracy to defraud the public is not open to doubt. As promoters these men stood in a fiduciary relation to the company to be organized, and those who should subscribe for its stock. As such they were bound to act in good faith and to deal with them in perfect candor. " The principle upon which courts of equity proceed in these cases is a very familiar one. The promoter of a company, like its directors, is deemed to sustain towards the members of the company the relation of a trustee toward his *cestui que trust*. This being so he will not be permitted to speculate out of that relation, or to derive any secret advantages from it. He is bound to disclose to them fully all material facts touching his relation to them, including the

amount he is to get for his services as promoter." Thompson on Corporations, section 457. The Telegraph v. Loetscher, *supra*. These men deliberately planned to violate such trust. The cases are numerous where promoters have undertaken to sell property at an excessive price, and thereby obtain a secret profit. This is uniformly held to be a fraud on the corporation and they are required to account for the difference. The method by which the corporation is to be plundered can make little difference. It is the fact of doing so, by whatever method, that the law condemns.

In pursuance of the scheme these promoters elected eight of themselves, including Petersmeyer, directors, and in serving as directors all agree that everything was done in accordance with the plans originally made.

3. SAME.    The first act of the board was to undertake to so manipulate the stock that it could be said to be "fully paid." But Smith, as he was both promoter and director, might not acquire a secret advantage for himself or others lawfully. He merely transferred the contract, which had cost him nothing and was without value, and received the stock without consideration. Of this he distributed about one hundred and eighty-five thousand shares to himself and the other nine promoters gratuitously. They then proceeded to dispose of the treasury stock to whomsoever could be induced to buy at twenty-five cents per share and a portion of the thirty-nine thousand shares at from six to ten cents a share. Those who bought had the right to assume, in the absence of knowledge to the contrary, that all other stockholders were paying the same price for stock issued as that they were contracting to pay. Heliwell on Stock and Stockholders, section 146.

This necessarily results from the relation of the directors who manage the corporation, and its stockholders for whom they are trustees and to whom they owe perfect fidelity in the discharge of their duties: *Hubbard v. Weare,* 79 Iowa, 678; *Marshall v. Farmers' & Mechanics' Sav. Bk.,*

85 Va. 676 (8 S. E. 586, 2 L. R. A. 534, 17 Am. St. Rep. 84) ; 10 Cyc. 787. In other words, subscribers to the stock of a corporation may act upon the supposition that those in charge of its affairs are dealing honestly with them. In discriminating between subscribers in the price of stock or in appropriating a part of it to their use, the directors do not deal fairly with them. " The stock of the corporation is supposed to stand in place of actual property of substantial value, and as being a convenient method. of representing the interest of each stockholder in such property, and to the extent to which it fails to represent such value it is either a deception or fraud upon the public, or an evidence that the original value of the corporate property has become depreciated." *Handley v. Stutz*, 139 U. S. 417 (11 Sup. Ct. 530, 35 L. Ed. 227).

*4. DIRECTORS: fiduciary relation.*

The increase of the number of shares without a corresponding addition to the assets of the corporation necessarily depreciates the value of each share. The issue of stock gratuitously is therefore violative of the rights of existing, nonassessable stockholders, and in fraud of subsequent subscribers and creditors who deal with the corporation on the faith of its capital stock. Purdy's Beach on Private Corporations, section 290.

*5. GRATUITOUS ISSUANCE OF STOCK: fraud.*

That the sale of stock to subscribers at any price after the promoters and directors had issued one hundred and eighty-five thousand shares to themselves· gratuitously with the purpose indicated without disclosing the fact was a fraud on subsequent subscribers is manifest. Even if the directors believed, as is contended, that all the stock would attain par value in worth, this did not justify their scheme of appropriating the greater part of the profits to their own use. Nor does the fact that they guarantied the company's notes relieve them. They proposed that the company should repay and the guaranty was in no manner the payment of the

shares issued to them. Nor was any of the money expended for the company with this end in view. It is said that they mutually agreed to carry out the enterprise. Suppose they did? The contract with Cox & Co. was contigent, and neither individually nor collectively were they legally bound to fulfill the company's obligations. If they devoted their time or expended their money after oil had been found, this was for the company, and not in compensation for the stock. Moreover, all was done in furtherance of their original design to acquire the property through stock issued to themselves for nothing and to saddle the expense upon the members of the public who might be induced to subscribe for shares.

The fact of the issuance of the stock to the directors was not disclosed in the printed matter or prospectus of the company, nor by Petersmeyer, in inducing the plaintiff to subscribe. Had this been done, he would not have purchased the stock, and it is safe to say that no one else would have done so. The directors, including Petersmeyer, as intelligent men must have understood this and in withholding facts so essential to any fair conception of the value of the stock in view of the design of the directors they were guilty of the fraudulent concealment and liable for damages resulting therefrom. *Hubbard v. Weare,* 79 Iowa, 678. The case is distinguishable from *Pulsford v. Richards,* 17 Beav. 97, for there it affirmatively appeared that the directors acted in good faith in allotting shares to themselves and that the circumstances were such that had the facts been disclosed subscribers would not have been deterred from taking stock. The wrongs pointed out are precisely those the promoters designed at their first meeting. The organization of the corporation, the issuance, manipulation, and sale of stock, involving breaches of duty both as promoters and directors, were in accordance with and steps in the execution of the scheme by these means to defraud those who might subscribe and pay for stock, out of a portion of the property to which

6. SAME: fraudulent concealment.

they should be entitled. A conspiracy is defined to be a combination of two or more persons to commit a criminal or unlawful act or a lawful act by criminal or unlawful means. Here a part of the means as well as the object was fraudulent, and each of the perpetrators is liable for damages suffered thereby. *Green v. Cochrane,* 43 Iowa, 544. And even though there were no conspiracy the defendant Petersmeyer is liable for damages resulting from fraudulent concealment in the sale of the stock. *Young v. Gormely,* 119 Iowa, 546. True there were no profits and the property acquired ceased to be of value. The persons promoting the enterprise suffered great loss in time and money. But neither of these facts can relieve them of liability for the wrongs perpetrated on others by fraudulently inducing them to part with their means.

III. In the second count of the petition it is alleged that Petersmeyer orally represented that the stock was paid up and nonassessable and also that each of the promoters had put $1,500 in the company. It may be the representation that the stock was nonassessable was merely expressive of an opinion that under the law the shares or certificate could not be taxed or assessed. *Upton v. Tribilcock,* 91 U. S. 45 (23 L. Ed. 203). This does not obviate the farther misstatement that the stock was fully paid.

7. False statements.

But plaintiff knew that he was buying treasury stock at one-fourth the par value and although the representation of the company in its printed matter and of Petersmeyer with respect thereto, if any he made, was false he could not have been deceived thereby. *Goff v. Hawkeye, P. & W. Co.,* 62 Iowa, 691.

8. Same.

Petersmeyer denied that he told plaintiff each of the promoters had paid $1,500 into the company's treasury. The plaintiff testified that he did and that but for such representation he would not have purchased the stock. The court might have accepted the latter statement as true and

we are not inclined to 'disturb its finding.    That a false representation of this kind is actionable cannot well be questioned.    It amounted to an assertion that the promoters then in management of the company were financially interested by way of an investment of $15,000, when in fact they had not deposited a cent in its treasury nor purchased a share of its stock.    That, with knowledge of the facts, plaintiff would not have parted with money for stock, is too manifest for argument.    Because of the deception he is entitled to recover the sum he was thereby induced to pay for the certificate issued to him:    See *Coles v. Kennedy,* 81 Iowa, 360; *Bank of Indiana v. Cook,* 125 Iowa, 111; Hubbard v. Weare, *supra.*

*9. SAME: corporate liability.*

IV.    Appellants contend that as the application for stock was reduced to writing it is conclusively presumed to contain all the representations which induced the subscriber to make it.    There is a syllabus in one case, to this effect.    *Smith v. Southern Bldg. & Loan Ass'n,* 111 Ga. 811 (35 S. E. 707).    But we are confident that, had the court undertaken to state its reasons for such a conclusion, a different result would have been reached.    At any rate the current of authority is that the general rule to the effect that parol representations are not admissible to vary the terms of a written agreement has no application to those representations which amount to a fraud on the part of the company, were made at the time of subscribing, and were the inducements by which the subscribers were obtained. *First National Bank v. Hurford,* 29 Iowa, 579; *Davies v. Dumont,* 37 Iowa, 47; *Rives v. Montgomery Plank Road Co.,* 30 Ala. 92; *Martin v. Railway,* 8 Fla. 370 (73 Am. Dec. 713); *Miller v. Wild Cat Gravel Road Co.,* 57 Ind. 241; *Kennebec & P. R. Co. v. Waters,* 34 Me. 369; *Water Valley Mfg. Co. v. Seaman,* 53 Miss. 655; *Piscataqua Ferry Co. v. Jones,* 39 N. H. 491; *Vreeland v. New Jersey Stone*

*10. PAROL EVIDENCE OF FRAUD: variance of writing.*

*Co.,* 29 N. J. Eq. 188; *Custar v. Titusville, G. & W. Co.,* 63 Pa. 381; *Blodgett v. Morrill,* 20 Vt. 509; 10 Cyc. 422. This is for the very satisfactory reason that the parol evidence is not introduced to vary or contradict the written application or contract, but to show that none such was even properly made.

V.    Appellants next enumerate a number of things that plaintiff knew before subscribing for the stock, such as the amount of the capital stock, that the only land owned by it
<div style="margin-left:2em"><strong>11. FRAUDULENT<br>SALE OF<br>CORPORATE<br>STOCK:<br>knowledge<br>of fraud:<br>evidence.</strong></div>
was that previously mentioned, the contract described, that the value of the stock depended upon the production of oil, and that the subscription was not paid and the certificate stock was not issued until a " gusher " was produced.    But there is no pretense that he knew the promoters had issued to themselves gratuitously one hundred and eighty-five thousand of the two hundred and eighty-eight thousand shares of stock issued, that the design of the promoters of the company was to shoulder all the expenses of the enterprise on the purchasers of the stock.    No doubt they believed that " oil would be struck " and the value of stock would equal its par value and thereby an investigation in the nature of a post mortem would not occur; but this furnished them no excuse for falsely concealing the fraudulent issuance of the bulk of the stock to themselves.    Nor was there anything to put him on inquiry as to the truthfulness of the representation that each of the promoters had invested $1,500. True, the plaintiff is a business man of experience.    Shortly after subscribing for stock he with three others contracted for two oil wells near those of the Sac Oil & Pipe Line Company's at a contingent cost of $22,000.    Later the syndicate entered into an arrangement with the company, each bearing half the expense, to procure oil from their wells by the use of compressed air, steam heads, and the like.    The oil was turned into one tank and the proceeds of its sale divided.    But all this emphasizes the fact of his confidence

in the promoters and directors of this company rather than to indicate that he was put on inquiry and should have detected the fraud practiced upon him.

VI.  It is farther contended that plaintiff is estopped from demanding rescission by his laches.  That this action was begun promptly upon the discovery of the cause alleged is not questioned but counsel say that the fraud should have been discovered sooner.  That with respect to the claims of subsequent creditors and subscribers for stock a shareholder " should act diligently to discover fraud " set up as a ground for rescission is doubtless true.  *Cedar Rapids Insurance Company v. Butler,* 83 Iowa, 124.  In such a case each stockholder is interested in the company and is charged with knowledge which by diligence he might have ascertained, and an action to rescind must be brought within a reasonable time after he has ascertained or should have learned of the perpetration of the fraud.  This was the conclusion reached in the great case of *Oakes v. Turquard,* L. R. 2 H. L. 325, and it has been followed since.  Thompson on Corporations, section 1323.  Possibly, as between the subsequent stockholder or creditor and a shareholder seeking to have his stock canceled, the latter would be required to examine the books and to avail himself of such information as these might afford.  But the relation of the shareholder to the company which has procured his subscription through its agents by fraud is somewhat different.  He stands the same as though the fraud had been perpetrated by some individual.  He is not required to suspect the promoters and directors of disregarding their obligation to those whom it was their duty to protect.  Where all seems fair he is not bound to inquire as though the contrary were true.  Of course, where the means of knowledge are at hand, and by ordinary diligence he should have ascertained the facts constituting the fraud, he will be charged with such knowledge.  For the means of knowledge are equivalent to knowledge, and a clue which, if followed up with ordinary diligence, would lead to a discovery, in law

is equivalent to a discovery — equivalent to knowledge. *German Savings Bank v. Des Moines National Bank,* 122 Iowa, 737. The evidence shows that the plaintiff was lulled into security, and did not suspect nor have any reasons to suspect the fraud practiced upon him, until a few days before beginning the action. This was suggested by ascertaining that some of the stock had been sold at from 6 to 10 cents per share and upon consultation with his attorney he was advised to examine the books of the company. These disclosed the failure to invest the money as claimed and the issuance of the stock to the promoters. We are of the opinion that he was not dilatory in discovering the fraud and should not be estopped from maintaining the action against the very parties who perpetrated the wrong.

It appears, however, that the company was insolvent at that time, and it is suggested that for this reason the stock ought not to be canceled. The accepted doctrine in England 12. CANCELLATION OF STOCK: insolvency of corporation: right of action. is that a subscription for stock cannot be rescinded where suit is instituted subsequent to the insolvency of the company and when its affairs are being wound up. *Stone v. City & County Ban.,* 3 C. P. 28; *Oakes v. Turquard,* L. R. 2 H. L. 325; *Henderson v. Royal British Bank,* 7 El. & Bl. 356, 363. It is said that no person who, at the commencement of the winding up, is *de facto* a member — that is, who has, by a contract not previously avoided, become a member — can withdraw from the distribution for the benefit of creditors any part of the company's assets, either by recalling money paid by him to the company or by taking himself out of the category of those liable to pay further calls. In consequence of the distribution of assets amongst creditors, a member cannot insist upon the equity which he might otherwise have claimed to be relieved from his contract with the company. 2 Thompson on Corporations, section 1441. But it seems that proceedings in insolvency of some nature must have

been begun, or at least resolved upon, or that payment has been stopped by the company by reason of its insolvency. 10 Cyc. 439.

Substantially the same doctrine prevails in this country, the difference being due to the fact that there is no public registration of shareholders here such as is required in England. In *Martin v. South Salem Land Co.,* 94 Va. 28 (26 S. E. 591), it was held that the shareholder cannot rescind his subscription on the ground of fraud as against *bona fide* creditors after the corporation has stopped payment and become actually insolvent unless he has been diligent in discovering and repudiating the fraud. But if he has been diligent in both these respects the insolvency of the company alone will not defeat his right to rescission. *Beal v. Dillon,* 5 Kan. App. 27 (47 Pac. 317); *Newton National Bank v. Newbegin,* 74 Fed. 135 (20 C. C. A. 339, 33 L. R. A. 727). The true rule, as it seems to us, is stated in *Fear v. Bartlett,* 81 Md. 435 (32 Atl. 322, 33 L. R. A. 721); and that is, the right to rescind may be exercised, assuming diligence, unless proceedings of insolvency, voluntary, or involuntary, have been instituted or some act has been committed which is regarded as an act of insolvency. Not until then does the entire property of the corporation, including unpaid subscriptions to its capital stock, become a trust fund for the payment of its debts, and not until then are the creditors entitled to the payment of their debts before there can be any distribution among the stockholders. " So long as the company is a going concern, having the possession and management of its property, contracts made by and with the company, are governed by the same principles of law as a contract between individuals; and such being the case, if one is induced to become a subscriber to its capital stock by the fraud of the company, and within a reasonable time after the discovery of the fraud, there being no laches on his part in discovering the fraud, repudiates his subscription, and this, too, before the in-

solvency of the company, under such circumstances he is, according to the settled law of this country, relieved of all liability on account of his subscription. He is relieved because he has the right to avoid a fraudulent contract, and because he has exercised this right. The subsequent insolvency of the company can upon no principle make him liable on a fraudulent contract which he has thus repudiated; and under such circumstances we cannot agree that the equities of the creditor are superior to the defrauded shareholder." The plaintiff subscribed for stock June 5, 1902, and this action was begun in February, 1904. The incorporation was proven to be insolvent when the action was begun; but how long it had been so was not shown. Nor does it appear that any proceedings in insolvency had been commenced, or that it had committed any act of insolvency. In these circumstances it cannot be said that the court erred in canceling the shares of stock issued to the plaintiff.

The decree is *affirmed.*