The CITIZENS BANK OF WINDSOR, Appellant-Respondent,

v.

Burnell LANDERS et al., Respondents-Appellants.

Nos. KCD 29078, KCD 29094.

Missouri Court of Appeals, Kansas City District.

July 31, 1978.

Motion for Rehearing and/or Transfer Denied Aug. 28, 1978.

William E. Simmons, Kansas City, Robert L. Wesner, Sedalia, for respondents-appellants; Miller, Simmons, Moore & Jung, Kansas City, Wesner, Wesner & Turley, Sedalia, of counsel.

Robert R. Raymond and Dennis D. Palmer, Kansas City, for appellant-respondent; Shughart, Thomson & Kilroy, Kansas City, of counsel.

Before WELBORN, Special Judge, Presiding, HIGGINS, Special Judge, and PRITCHARD, J.

PRITCHARD, Judge.

This case consists of cross-appeals, one by the appellant-respondent Bank from a verdict and judgment against it and in favor of the Landers on a guaranty, $48,000, plus interest, attorney fees and collection costs (Count I); and one by respondents-appellants Landers from a verdict and judgment against them for $12,000.00 as maker and guarantor (Mrs. Landers) upon a promissory note, plus interest, $1,393.31, and attorney fees and costs of collection, $3,158.64, in favor of the Bank (Count II).

J. W. Simmons was the Bank's president. In the spring of 1971, Simmons and Archie Eugene Finley had discussions about taking over a defunct manufacturing company in Windsor, Missouri. Finley was then employed and remained employed by a company called Norandex. As a result of the discussions a new company, Windsor Manufacturing Company, was formed May 24, 1971, with Finley as its president. Finley continued his Norandex employment covering 38 states and 2 foreign countries because that company was considering stopping the manufacture of storm windows and was considering an outside source, assured to be Windsor, for that item. The Bank loaned Windsor $100,000 at its start, guaranteed by the Small Business Administration. In December, 1972, Finley received a call from Simmons informing him that he wanted $48,000. Finley asked him why and Simmons said, " 'Well, I don't know, I can't give you the exact answers, but it seems that we have loaned the company money on

accounts receivable. The receivables have been paid but I didn't get any money, so I want you to get here and pay me.'" As a result, Finley got Dr. Landers, his friend and neighbor, to sign a note, the subject of Count II, for $12,000, which note was prepared by Simmons. The proceeds of that note were deposited in Finley's special account, and were used in part to pay the Bank interest owed by Windsor.

There was then a discussion in 1973 between Simmons and Finley about the purchase for Windsor of a Chicago subsidiary company of Allied Products called Star-Brite, which manufactured and sold house, yard and driveway signs and markers. SBA, however, because of Windsor's existing indebtedness, took the position that the Bank's second loan to Windsor, $80,000, in 1973, could not be used to purchase the Star-Brite company of Chicago. The subject then came up of forming a separate (Missouri) corporation, Star-Brite, Inc., in order to obtain an SBA guaranteed loan. On May 10, 1973, the separate corporation was formed, its Board of Directors on May 11, 1973, being Finley, Gene Roberts and Simmons. Simmons was also its elected Secretary-Treasurer. At that time Windsor was losing money.

After Star-Brite, Inc., was formed, Simmons and Finley discussed getting an SBA loan, and there was a discussion about using Star-Brite, Inc., money that was borrowed in its name for Windsor in the summer or early fall of 1973. Simmons knew from his experience in handling probably a dozen SBA loans, that it would require guarantors. Prior to any loan application being submitted for Star-Brite, Inc., Simmons and Finley met with SBA in Kansas City, and there confirmed that it would be necessary to have guarantors on the loan. Dr. Burnell Landers, Finley's friend, and a social and professional acquaintance of Simmons, was suggested as a possible guarantor. Finley then invited Dr. Landers to Windsor, Missouri, for the purpose of meeting with Simmons as well as looking over the companies.

Dr. Landers went to Windsor in early September, 1973, to Simmons' home, and there, in Simmons' kitchen, met with Finley and Simmons, and had a discussion about Star-Brite, Inc., in which Simmons took the lead. He told Dr. Landers that Star-Brite, Inc., was and definitely could be a very successful, profit-making company. Dr. Landers was told that they would like him to be a part of Star-Brite corporation, "and so—there was a discussion of the distribution of stock. Q Was Dr. Landers supposed to get any stock? A At that meeting, it was agreed that Dr. Landers was to receive forty percent. Q What was Dr. Landers supposed to do in return for getting this forty percent? A He was to sign the guaranty for one hundred and twenty thousand dollar S.B.A. application, and for his forty percent he would only be liable for forty percent of that one hundred and twenty thousand dollars." [Finley testifying.]

At that meeting, no one told Dr. Landers that Windsor Manufacturing Company had only operated profitably one month since 1971, or that some of Star-Brite's money was going to be used to help pay out Windsor. Later, they submitted the loan application, which noted the fact that the Landers would be guarantors, and it was approved (by SBA), and the Bank loaned Star-Brite $120,000 which was put in its account at the Bank on October 12, 1973, and on that same day $80,773.34 was transferred from that account to Windsor's account, and a loan to Windsor for $80,000 was shown on Star-Brite's books. It is not precisely clear in the record whether Landers' SBA form guaranty was ever forwarded to SBA, the form providing for a 100% guaranty instead of 40%. Dr. Landers crossed out a portion of the form and apparently retained it as not being acceptable. Star-Brite's notes receivable account shows that six loans, totalling $118,755.26, were made to Windsor.

Dr. Landers testified: "Q Did J. Simmons say anything to you about whether or not you should participate in any sort of investment or anything to do with Star-Brite? A He told me that, he said that—well, let me back up. The point was that Mr. Finley

had made the statement that they could get the products of Star-Brite into the True Value Stores, Ace Hardware Stores, Western Auto, those are the three big ones. And he repeated this. Q He repeated this? A He repeated the fact that he could get this done. I remember this, that Mr. Simmons stated that he knew that a man that ran or was the head of Walmart and they could get those products into that line of stores also. Q Was anything said about making an application to the S.B.A. for a loan or S.B.A. participation in a loan that was to be made to Star-Brite? A Yes, sir. This was the part I was to play. I was to—as it was explained to me, on the basis of my guaranty, that this would help Mr. Finley and Mr. Simmons get an S.B.A. loan to get Star-Brite off the ground. Q Were you to receive anything in exchange for giving that guaranty? A Forty percent of the stock of Star-Brite." Dr. Landers admitted that prior to the execution of the note and the security on the guaranty agreement, he had no discussions with Simmons about the financial condition of Star-Brite, Inc., or of Windsor Manufacturing Company. He did not know how much stock was outstanding in Star-Brite, Inc., at the time he executed the guaranty agreement, or from whom he was to receive 40% of the stock. It was his understanding that Finley was the sole stockholder of Star-Brite.

The Star-Brite, Inc., loan application to SBA reflected that Dr. Landers was 40 percent owner of the company, and SBA's preliminary commitment provided this condition, among others, "13. Personal Guaranty on SBA Form 148 of Burnell Landers and Linda Long Landers, his wife; * * * each of said Personal Guaranty shall be collateralized with an Assignment with Full Voting Rights of all Stock, Warrants and Options of the corporate Borrower owned by said Guarantors, or any of them." Dr. Landers received a copy of the commitment containing the conditions, and he testified that it gave him confidence that the SBA loan had "been approved and that things were moving forward to the fact that my, that I was entitled to, I thought, some stock after I read this letter."

On October 31, 1973, Star-Brite's board of directors, including Simmons, passed resolutions authorizing him, among others, to borrow money and sign checks for the corporation. In two meetings, November 1 and 27, 1973, the board transferred all of Star-Brite's outstanding common stock to Windsor Manufacturing Company. According to Finley, this was done because "in essence everything that Windsor owned, or Gene Finley, according to SBA's conditions, was collateralized by their loan. So it made no difference. Windsor Manufacturing Company owned Star-Brite—period." There was also a reason given that there would be a tax advantage resulting from the transfer.

Simmons and Finley procured from Roberts and Finley guaranties dated October 12, 1973, the Bank's $120,000 loan to Star-Brite, Inc., being made on October 21, 1973. The guaranty of Dr. Landers and his wife to the Bank is dated January 9, 1974, which is after the loans from Star-Brite to Windsor were made, and after the transfer of Star-Brite's common stock to Windsor. The discrepancy in dates is not explained in the record, but Dr. Landers was never told that Star-Brite had supplied funds to Windsor, or that the stock was going to be transferred, or that the SBA application had been withdrawn. SBA learned of the relationship between Star-Brite and Windsor in November, 1973, and called Finley and Simmons to Kansas City for a series of meetings. They, accompanied by an attorney, Riley, went to Kansas City to confer with SBA officials, who were angry about the fact that Star-Brite was actually a part of Windsor, and the officials were expressing some displeasure that they had not been told before issuing the commitment for the $120,000 loan. It was recommended to Simmons that he withdraw his application "for the SBA loan, let things cool down, spin it out and resubmit it at a later date." Simmons did withdraw the application in December, 1973, and received the return of all papers, including Dr. Landers' guaranty. Finley asked Simmons if he was going to

return Landers' guaranty to them, but he said, "A In so many words, no way would he return the guaranty because it made a good bankable loan and would protect him on bank examiners." [Bearing on this testimony is the uncertainty as to whether Simmons ever had the Landers' guaranty in his possession, but it would make no difference in the failure to disclose facts in connection with the procurement of the new guaranty, running to the Bank, of January 9, 1974, as below discussed.]

Star-Brite, Inc., never became a going concern, but if all the money that it had received had been used for it (rather than for Windsor) "there is no doubt about it, it would have been a profit-making company", (according to Finley).

The $120,000 loan of October 21, 1973, which was the subject of the SBA application, was paid off, $40,000 on June 13, 1974, and $80,000 on August 16, 1974. The note given by Star-Brite to the Bank, against which it sought to apply the Landers' guaranty [it being for "credit given" and hereafter given by said Bank] was in an initial amount of $128,387.65, dated August 16, 1974.

As to Count I, the Landers submitted these four affirmative defenses: In Instruction No. 6, a false representation that the loan made to Star-Brite, to which the guaranty applied, would be guaranteed by the Small Business Administration, and that the Landers would receive common stock in Star-Brite, Inc., in exchange for executing the guaranty; in Instruction No. 7, upon the same propositions, but that reasonable care was not exercised in making the representations; in Instruction No. 8, that there was a failure, in the exercise of reasonable care of the Bank to disclose to the Landers that Star-Brite's common stock was transferred to Windsor Manufacturing Company, or that the funds were used for the obligations of the latter company, or that the Bank caused SBA to cancel its guaranty of a loan commitment to Star-Brite, and that the guaranty executed by the Landers was not in connection with any loan guaranteed by SBA; and in Instruction No. 9, the same

proposition of Instruction No. 8 was submitted, but upon the basis that the Bank had knowledge of the undisclosed facts, that there was a relationship of confidence or trust between the Bank and the Landers to whom the undisclosed facts were material in executing the guaranty.

■ In the first of its prolix points, the Bank contends that it is entitled to judgment as a matter of law upon its guaranty because the Landers admitted the execution and delivery of the document. That would be true were it not for the affirmative defenses asserted. The real inquiry is whether the Landers pleaded legal defenses, and if so, whether they were proved by substantial evidence, and whether the defenses were properly submitted in the instructions.

The submission of Instruction No. 6, supra, is pleaded that Simmons, acting within the scope of his employment as president of the Bank, knowing statements to be false, or recklessly without regard to their truth or falsity, and acting with intention that defendants rely, made misstatements of material fact relied on by defendants, or knowingly or with utter and reckless disregard of consequences omitted to state material facts which he had a duty to disclose (in that) (a) he stated to Dr. Landers that a loan to Star-Brite, Inc., would be guaranteed by SBA, which would meet SBA requirements if Dr. Landers would execute a guaranty of a portion of the loan; and at no time did Simmons disclose the action of Star-Brite in transferring shares of its stock to Windsor, or that the issuance of the stock would impair Star-Brite's ability to meet the conditions of the SBA loan guaranty. The Bank attacks the Instruction No. 6 theory that at the time they were made, September 3, 1973, there was no evidence that they were false and Simmons knew they were false. Expanding, the Bank says that the "allegations are not statements of existing facts necessary to a misrepresentation affirmative defense; rather they are statements of alleged promises of events to take place in the future."

The usual case of fraud requires that there be a misrepresentation of a present, existing fact. *Reed v. Cooke*, 331 Mo. 507, 55 S.W.2d 275, 278[2–4] (Mo. banc 1932); *Bayer v. American Mutual Casualty Company*, 359 S.W.2d 748, 754[9, 10] (Mo.1962); *Yerington v. Riss*, 374 S.W.2d 52, 58[5] (Mo. 1964), and cases and authority cited, wherein the exception was noted, " '[A] false statement of a present purpose may be a misstatement of a fact.' " This exception was developed in *Brennaman v. Andes & Roberts Brothers Const. Co.*, 506 S.W.2d 462, 465 (Mo.App.1973), noting the apparent divergent lines of authority of *Reed v. Cooke*, supra, and others, and cases cited: "In the decisions cited, appeal followed trial on the merits and therefore a factual record was available with which to measure the claimant's petition allegation. On the one hand, recovery was denied where the evidence showed the alleged misrepresentation of intention to have been a mere promise or matter of opinion subsequently unfulfilled for which the proper remedy is a suit on the promise. [3, 4] Those cases in which recovery for fraud is permitted require an entirely different evidentiary basis. The essence of the fraud being a misrepresentation of an existing fact, *the burden of proof requires the claimant to establish by the evidence a current intention by the promisor at the time the agreement is made not to perform*. Failure of performance is insufficient to establish this intent or to shift the burden of proof." [Italics added.] In this case there was no evidence, at the time the alleged representation was made in early September, 1973, that Simmons knew that SBA would not guarantee the Star-Brite loan to the Bank. In fact, the evidence was that an initial approval or commitment by SBA was given, which apparently was the basis for the $120,000 loan to Star-Brite on October 21, 1973, but the commitment was later withdrawn. There was further no evidence that Simmons, in early September, 1973, had a current intention not to transfer Star-Brite common stock to Dr. Landers in return for his guaranty. Thus, the submissions of Instructions No. 6, and necessarily, No. 7, of the same propositions but on a standard of reasonable care, were in error because not supported by the evidence as they must be. *Brassfield v. Sears*, 421 S.W.2d 321, 323[1, 2] (Mo.1967); *Stotler v. Bollinger*, 501 S.W.2d 558, 560[1, 2] (Mo. App.1973).

As the facts show, Dr. Landers executed the guaranty of January 9, 1974, upon which the Bank sues, *after* these events took place: (1) The Bank withdrew its SBA application for guaranty upon the SBA objection that Star-Brite's funds were being diverted to Windsor; (2) the money loaned by the Bank to Star-Brite was reloaned in substantial amount to Windsor; (3) Star-Brite transferred its outstanding common stock to Windsor (thus, rendering it impossible that Dr. Landers receive his 40% of Star-Brite's stock in return for his executing the guaranty). Dr. Landers was never informed of any of these events. Instructions Nos. 8 and 9 substantially submitting these facts along with the proposition of law—that of a failure in the exercise of reasonable care to disclose them having superior knowledge of them; and (Instruction No. 9) there was an intentional failure to disclose these known facts, and that there was a relationship of confidence and trust between J. W. Simmons and the defendants. A mere social and professional relationship, as it is argued, between Simmons and Dr. Landers would not give rise to a relationship of trust and confidence requiring a duty to disclose, and there is lacking any evidence that Dr. Landers reposed any special confidence in Simmons during their discussion. See *McKeehan v. Wittels*, 508 S.W.2d 277, 279, 280[2–3] (Mo.App.1974), as to factors which may establish a confidential relation giving rise to fiduciary obligations. The giving of Instruction No. 9 was thus in error. Rather, the duty to disclose would arise from Simmons' superior knowledge of the facts when Simmons knew or should have known that they would have been material in causing him to execute the guaranty. Materiality, if Dr. Landers had been advised of the facts, is demonstrated in his continued belief that SBA participation and supervision would lend a measure

of success to Star-Brite, and SBA participation had been withdrawn; that he did not know that Star-Brite's borrowed funds, necessary to its success, had been diverted to the defunct Windsor company; and he did not know that his promised common stock had been transferred to Windsor. The propositions submitted in Instructions Nos. 8 and 9, in the aspect of non-disclosure, in reality sound in fraud, alluded to in *Vendt v. Duenke*, 210 S.W.2d 692, 699[2] (Mo.App. 1948), where the defendants failed to disclose the known material fact, uncontroverted by them, and unknown to plaintiffs, that a house had been built on soft filled-in ground. The court said, "There must also exist a legal duty on the part of the latter to disclose, which duty may arise from a relation of trust, from confidence, *inequality of condition, or superior knowledge* which is not within the fair and reasonable reach of the other party. (Citing authority and cases.) * * * If a jury should believe the foregoing evidence, then they would be justified in finding that defendant Duenke was under a duty to disclose to plaintiffs the manner of construction of the house in question in the particulars complained of, and that he practiced a fraud and deceit upon them in failing to do so." [Italics added.] See also the equity cases of *Jones v. Arnold*, 359 Mo. 161, 221 S.W.2d 187, 193[12–14] (1949); *Ash Grove Lime & Portland Cement Co. v. White*, 361 Mo. 1111, 238 S.W.2d 368, 372[4, 5] (1951); and *Miller v. Higgins*, 452 S.W.2d 121, 124[3–5] (Mo.1970). Quite apparently, the Landers have misconceived the nature of their defensive remedy. Upon retrial of Count I, the parties will be free to explore the issue of the Landers' opportunity, or lack of a reasonable opportunity, to learn the facts for themselves, as that might bear upon Simmons' duty to disclose such facts.

The Bank contends that the representation that Dr. Landers would receive 40% of Star-Brite's stock is one of law which cannot be made a basis for fraud. As noted, there being no evidence of Simmons' current intention not to cause the stock to be issued, as submitted in Instructions Nos. 6 and 7, that is now out of the case except for non-disclosure that all outstanding stock had been transferred to Windsor making it unavailable to Dr. Landers in fulfillment of the promise made to him. On re-trial, any issue of fraudulent non-disclosure of the transfer of Star-Brite's common stock to Windsor would have to relate back to the original promise to Dr. Landers as bearing upon his continued expectation that stock would be issued to him, and not become unavailable. The argument is based upon the provisions of Const.Mo.1945, Art. XI, § 7, and § 351.160 RSMo 1969, that "no corporation shall issue stock, * * * except for money paid, labor done or property actually received; * * *." Because the issue may arise on new trial as to Count I, attention is directed to the case of *Hartley Realty Company v. Casady*, 332 S.W.2d 291 (Mo.App.1960), where a misstatement of law was made to defendant that a six months' apprenticeship was a prerequisite requirement for taking the examination for a real estate broker's license, thus inducing him to sign a contract with a non-competition clause and a liquidated damage penalty. At 332 S.W.2d 293[2–3], the court quoted 17 C.J.S. Contracts § 158, p. 511, " 'However, misrepresentations of law may constitute fraud avoiding contracts where the speaker sustained a confidential relation toward the hearer, or *possessed superior means of information*, or wilfully misled him into a misconception of his rights and liabilities.' " See also the cases and authority cited at pages 294 and 295 of the *Hartley* opinion. As to the capability of performance of the promise to Dr. Landers to issue him 40% of the Star-Brite stock, despite the constitutional and statutory provisions, see *Eastern Oklahoma Television Company, Inc. v. Ameco, Inc.*, 437 F.2d 138 (C.A. 10th 1971), holding that a personal guaranty of an obligation of the corporation, was, in part, adequate consideration for the issuance of stock under constitutional and statutory provisions like those here. The court said, page 143, "Absent the guaranty, the essential equipment for the operation of a television station could not have been obtained. The organizers personally fur-

nished the security for the purchase of this property. \* \* \* The record clearly indicates that the result of this security was the completion of the station, which eventually led to a successful corporate operation. The guaranty was valuable property or services within the meaning of the Oklahoma Constitution." So, here the Landers' personal guaranty enabled Star-Brite to obtain the SBA commitment and the Bank's extension of credit, and a possible successful operation, as the record shows, had the funds been used for Star-Brite and not diverted to Windsor. Absent non-consenting shareholders or creditors the issuance of the stock to him would have been supported by a valuable consideration, and would have been good as between Dr. Landers and the existent, participating shareholders of Star-Brite at the time the promise was made. An ancient case contrary to *Ameco, Inc.,* supra, is *Hinkley v. Sac Oil & Pipe Line Co.,* 132 Iowa 396, 107 N.W. 629, 632 (1906).

The Bank says that there was no evidence that Simmons made representations that the Landers would receive Star-Brite stock in exchange for their guaranty, the only evidence being that the representation was made by Finley. The argument ignores the inferences which the jury could legitimately draw from the September, 1973, kitchen discussion in which Simmons took the lead. He was part and parcel of the proposed enterprise, and his superior knowledge and condition is shown by the fact that he had engaged in at least a dozen SBA negotiations. Dr. Landers was a full-time practicing physician, being as Simmons acknowledged "a very busy man." As is shown by his refusal to return the Landers' guaranty after the SBA guaranty commitment was withdrawn, which was after the Bank made the loan to Star-Brite, Simmons interest was to protect the Bank, and that would include, as the jury might find, the non-disclosure of facts bearing on the Landers' decision to execute the guaranty, here sued upon, of January 9, 1974.

The Bank says no representations were made to Mrs. Landers. It is clear, however, that representations were made to Dr. Landers, and he and his wife discussed the proposition after which they both executed the guaranty. The contention is without merit. Other points raised by the Bank as to Count I either need not be ruled at this time, and if they arise on new trial, the parties are sufficiently apprised by their briefing to meet them on the new trial. Because the submissions in Instructions Nos. 6, 7 and 9 are not supported by the evidence, as above held, the case must be remanded for new trial as to Count I of the Bank's petition. *Stotler,* supra.

■ On their appeal from the judgment against them upon Count II of the Bank's petition, the Landers first contend that they were discharged from the obligation to pay the note because it was altered as to due date, citing § 400.3–407, RSMo 1969. The note, dated December 18, 1972, was payable upon demand, with interest from date at 8% per annum, payable semi-annually. A first notice of interest due was sent to Dr. Landers, who contacted Simmons who said the matter would be taken care of. Apparently, Finley, for whose accommodation the note was given, paid the three interest payments at approximate six-month intervals. The written notations are on the note's face, "July 10, 1974; June 16, 1973; Jan. 3, 1974; Feb. 15, 1975." The Landers say these dates are an alteration in the sense that the due date was extended. Clearly, from the evidence, the date notations related to the times when interest would be due, and is not an extension of the due date of the demand note. See *Lynes v. Holt-Taylor,* 268 S.W. 702, 705[6–8] (Mo. App.1925), holding that periodical collection of interest is not an extension of time for payment and "A demand note is, by its very nature, without specification of date of maturity. Demand for payment fixes the date of maturity." The contention is without merit.

■ Instruction No. 11 given by the court is: "Your verdict must be for plaintiff and against defendants Burnell Landers and Linda Landers on plaintiff's Count II $12,000.00 promissory note claim; Unless you believe plaintiff is not entitled to recov-

er against such defendants by reason of Instruction No. 12. Not in MAI." The Landers say the giving of this instruction was error first because it failed to include the element that Dr. Landers had given the note sued on. He, throughout the case, admitted the execution and delivery of the note. This conceded fact need not have been submitted. *Young v. Frozen Foods Express, Inc.*, 444 S.W.2d 35, 40[5, 6] (Mo. App.1969), but however that may be, there was no trial court objection to the instruction on that ground, or on the second assertions that there was omitted the elements that there was consideration received, that the time for payment was past due, that demand had been made but that there was failure to pay the note. The claims of error here were not presented to the trial court, and therefore were not preserved for review. *Robinson v. St. John's Medical Center, Joplin*, 508 S.W.2d 7, 11[7–9] (Mo.App. 1974).

■ A further attack upon Instruction No. 11 was presented to the trial court and is preserved for review. In essence, the contention is that the instruction submitted as against Mrs. Landers a theory of liability (which was on the note) different than her liability on the guaranty of payment. In this, she is correct. Her liability is secondary or collateral to that of Dr. Landers on his note. *Beauchamp v. North American Sav. Ass'n*, 543 S.W.2d 536, 537[2–5] (Mo. App.1976). The bases for liability should have been submitted separately as to Dr. and Mrs. Landers. See the approved form of guaranty instruction in *Linwood State Bank v. Lientz*, 413 S.W.2d 248, 256 (Mo. 1967). Dr. Landers' note was given by him on December 18, 1972, and Mrs. Landers' guaranty of payment was given September 3, 1973. No issue is presented as to a lack of consideration, but it may arise on re-trial, in which event, see *MacFarland v. Heim*, 127 Mo. 327, 29 S.W. 1030, 1031 (1895), and 38 Am.Jur.2d Guaranty, § 45, p. 1047.

■ The Bank has lodged a motion with this court asking for attorneys' fees on this appeal as to both counts. There is no judgment upon Count I for the Bank, and

that count is reversed and remanded for new trial. The notes sued upon provide for collection costs and attorneys fees. Such provisions are valid. *American Savings Bank v. Sutton*, 204 S.W. 572[1] (Mo.App. 1918), and cases cited. No cases have been cited from this state allowing collection costs and attorneys fees provided by contract beyond the time of judgment entered in the trial court. It is, however, the rule in Missouri that in an action for the recovery of money the cause of action is merged in the judgment for plaintiff and is extinguished. *Household Finance Corporation v. Avery*, 476 S.W.2d 165, 167 (Mo.App.1972); *McQuerry v. Bank of El Dorado Springs*, 230 Mo.App. 1215, 96 S.W.2d 515, 519[4] (1936). The causes of action would be for the recovery of the principal amount of the notes, plus interest, collection costs and attorney fees, and upon recovery of the judgment, these items would be merged therein, and the judgment would only bear interest at 6% per annum until satisfied under § 408.040, RSMo 1969. Other jurisdictions have applied the doctrine of merger of the cause of action into the judgment and have denied further attorneys fees on appeal. *McCormick v. Falls City Bank*, 57 F. 107, 111 (C.A. 7th 1893); *Hales v. Snowden*, 40 Cal.App.2d 801, 105 P.2d 1015 (1940) [holding that the rights of the parties are governed by the decree entered after the mortgage provisions were merged therein]; *Honey Creek Corp. v. WNC Development Co.*, 331 N.E.2d 452, 459[3] (Ind.App.1975); Anno. 52 A.L.R.2d 863, 871. *Centennial State Bank v. S.E.K. Construction Co., Inc.*, 518 S.W.2d 143, 151 (Mo.App.1974), is of no aid to the Bank because that was a case where an insurer refused to defend its insured, thus violating its contract to defend throughout. Dissolution of marriage costs and legal services after entry of judgment are governed by statute, § 452.355 (L.1973, p. 470, § 12, eff. Jan. 1, 1974). Other cases cited have no contractual provision for the payment of these expenses. The motion is overruled.

The judgment upon Count I is reversed and remanded for new trial in its entirety.

As to Dr. Landers, the judgment is affirmed upon Count II. The judgment against Mrs. Landers upon Count II is reversed and as to her, the case is remanded for new trial, but with directions that the judgment against Dr. Landers be held in abeyance until the liability of Mrs. Landers shall have been determined upon new trial.

All concur.